[No. A107905. First Dist., Div. Four. Dec. 9, 2005.]

WARREN A. SLOCUM, as County Assessor, etc., et al., Plaintiffs and Respondents, v.
STATE BOARD OF EQUALIZATION, Defendant;
GARY ORSO, as County Assessor, etc., et al., Interveners and Respondents;
AMERICAN AIRLINES et al., Interveners and Appellants.

## COUNSEL

Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller and Eric J. Miethke for Interveners and Appellants.

Richard E. Winnie, County Counsel (Alameda), Claude F. Kolm, Deputy County Counsel; Thomas F. Casey III, County Counsel (San Mateo), Lee A. Thompson, Deputy County Counsel; Ann Miller Ravel, County Counsel (Santa Clara), James J. Rees, Deputy County Counsel; John J. Sansone, County Counsel (San Diego), Walter DeLorrel III, Deputy County Counsel; Robert A. Ryan, County Counsel (Sacramento), Thomas Parker, Deputy County Counsel; Benjamin P. deMayo, County Counsel (Orange), James C. Harman, Deputy County Counsel; William C. Katzenstein, County Counsel (Riverside) and Ash Hormozan, Deputy County Counsel, for Plaintiffs and Respondents and for Interveners and Respondents.

## OPINION

**REARDON, Acting P. J.**—Recognizing that in the aftermath of the events of September 11, 2001, "[a]ccess to airport property throughout California was restricted," in 2002 the California State Board of Equalization (SBE or board) promulgated a regulation to permit midyear reassessment of property suffering loss in value because of such diminished access. (Cal. Code Regs., tit. 18,

§ 139 (hereafter, Rule 139).) Entitled "Restricted Access as Damage Eligible for Reassessment Relief Pursuant to Revenue and Taxation Code Section 170," the SBE specifically drafted Rule 139 with air carriers and airport concessionaires in mind. (*Id.*, "Example.") Respondent county assessors[1] challenged the regulation on constitutional and statutory grounds. The trial court concluded that Rule 139 was "inconsistent with Tax Code § 170" and therefore proclaimed it invalid. We agree and accordingly affirm the judgment.

## I. CONSTITUTIONAL, STATUTORY AND REGULATORY CHAIN OF AUTHORITY

■ In California, county assessors are charged with assessing "all property subject to general property taxation at its full value." (Rev. & Tax. Code,[2] § 401.) Except for state-assessed property, all taxable property in a county is assessed annually to the person who owns, possesses, claims or controls it on the lien date, which is January 1. (§§ 405, subd. (a), 2192.)

■ Adopted November 5, 1974, article XIII, section 15 of the California Constitution empowers the Legislature to authorize local taxing entities "to provide for the assessment or reassessment of taxable property physically damaged or destroyed after the lien date to which the assessment or reassessment relates." Pursuant to this authority, the Legislature enacted section 170, a broad property tax disaster relief statute. Subdivision (a) of section 170 authorizes county boards of supervisors to pass ordinances which allow assessees of taxable property "whose property was damaged or destroyed without his or her fault" to apply for reassessment of that property. The statute goes on to state: "To be eligible for reassessment the damage or destruction to the property shall have been caused by any of the following: [¶] (1) A major misfortune or calamity, in an area or region subsequently proclaimed by the Governor to be in a state of disaster, if that property was damaged or destroyed by the major misfortune or calamity that caused the Governor to proclaim the area or region to be in a state of disaster. As used in this paragraph, 'damage' includes a diminution in the value of property as a result of restricted access to the property where that restricted access was caused by the major misfortune or calamity. [¶] (2) A misfortune or calamity. [¶] (3) A misfortune or calamity that, with respect to a possessory interest in

---

[1] Respondents are the duly elected assessors of the Counties of Alameda, Orange, Riverside, Sacramento, San Diego, San Mateo and Santa Clara (collectively, the Assessors).

[2] Unless otherwise specified, all statutory references are to the Revenue and Taxation Code.

land owned by the state or federal government, has caused the permit or other right to enter upon the land to be suspended or restricted. As used in this paragraph, 'misfortune or calamity' includes a drought condition such as existed in this state in 1976 and 1977." (§ 170, subd. (a)(1)–(3).)

In turn, Rule 139 represents an attempt to interpret the term "damage" as used in section 170. Of interest in this action are the following provisions: "(a) For purposes of determining property eligible for reassessment pursuant to . . . section 170, the term 'damage or destruction' includes diminution in the value of the property resulting from a period of restricted physical access to the property. [¶] (b) 'Restricted physical access to the property' means that access to the property was wholly or partially denied to the property owner and/or operator, or that the normal business activities of the property owner and/or operator were suspended as a result of compliance with a directive, order, law or other exercise of police or regulatory powers by the federal, state or local government." (Rule 139, subds. (a)–(b).)

## II. PROCEDURAL BACKGROUND

The SBE duly promulgated Rule 139 in accordance with the procedures set forth in the Administrative Procedures Act (APA). (Gov. Code, § 11340 et seq.) Following its enactment, the assessors of the Counties of San Mateo, Santa Clara, Alameda and San Diego sought declaratory relief concerning the validity of the rule and the assessors of Riverside, Sacramento and Orange Counties quickly and successfully applied to intervene. The SBE was named as the defendant; several airlines, appellants herein,[3] also intervened. The SBE has not appealed the judgment.

The parties filed cross-motions for summary judgment. The trial court granted the Assessors' motion and denied the motions of SBE and Airlines. This appeal, by Airlines only, followed.

## III. DISCUSSION

A. *Standard and Scope of Review*

1. *Standard of Review*

We undertake de novo review of the trial court's decision to grant summary judgment. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110

---

[3] Appellants are American Airlines, United Airlines, Alaska Airlines, Aloha Airlines, America Trans Air, Continental Airlines, Delta Airlines, FedEx, Northwest Airlines and Southwest Airlines (hereafter, Airlines).

Cal.Rptr.2d 370, 28 P.3d 116].) As well, issues of statutory and constitutional interpretation raise pure questions of law, subject to independent appellate review. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10].)

### 2. Scope of Review

The parties squabble over whether Rule 139 is a quasi-legislative rule implicating the SBE's exercise of a delegated lawmaking power, or an interpretive rule in which the agency construed section 170's legal meaning and effect. We afford quasi-legislative rules the dignity of statutes. Therefore, when we scrutinize the validity of such rules, our scope of review is narrowly confined to determining whether the regulation (1) comes within the scope of the controlling statute and (2) is reasonably necessary to carry out the statutory purpose. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) However, courts do have the last word when it comes to "deciding whether a regulation lies within the scope of the authority delegated by the Legislature." (*Id.* at p. 11, fn. 4.) In short, agencies do not have discretion to promulgate regulations that are inconsistent with the governing statute, or that alter or amend the statute or enlarge its scope. (*Ontario Community Foundations, Inc. v. State Bd. of Equalization* (1984) 35 Cal.3d 811, 816–817 [201 Cal.Rptr. 165].)

An agency's expertise with respect to pertinent legal and regulatory issues lends presumptive value to interpretive regulations. Nonetheless, agency interpretations, whether expressed in a regulation or less formal statement, are nothing more than legal opinions freighted with a diminished power to bind. (*Yamaha, supra,* 19 Cal.4th at p. 11.) The final construction of a statute rests with the courts, and in exercising that power we accord weight to an administrative interpretation based on the particular context. (*Id.* at p. 12.)

Courts have identified certain factors signifying that the agency's interpretation of a given statute is probably correct. These include evidence that the agency consistently followed the interpretation in question, and the interpretation was contemporaneous with enactment of the statute subject to interpretation. (*Yamaha, supra,* 19 Cal.4th at pp. 12–13.) Judicial deference is more deserving under circumstances indicating that the interpretation was part of a regulation adopted by the agency in accordance with the APA, rather than contained in an advice letter prepared by a staff member. "However, even formal interpretive rules do not command the same weight as quasi-legislative rules." (19 Cal.4th at p. 13.) Again, in the end it is the courts that discern the meaning of statutes.

Our Supreme Court has acknowledged that "administrative rules do not always fall neatly into one category or the other; the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature." (*Yamaha, supra,* 19 Cal.4th at p. 6, fn. 3; see *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 799 [85 Cal.Rptr.2d 844, 978 P.2d 2].) As further explained in *Ramirez, supra,* at page 799, regulations falling somewhere along the continuum may share characteristics of quasi-legislative and interpretive rules, "as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms."

Here the SBE indicated it was promulgating Rule 139 pursuant to Government Code section 15606, subdivision (c). Among other duties, this enabling statute mandates that the SBE "[p]rescribe rules and regulations to govern . . . assessors when assessing . . . ." (Gov. Code, § 15606, subd. (c).) On the quasi-legislative side of our analysis, without question the enactment of Rule 139 comes within the scope of duties delegated to the board by Government Code section 15606 because Rule 139 elaborates the meaning of "damage or destruction" for the purpose of applying section 170, therefore prescribing a rule that would govern all assessors when providing calamity reassessment relief under that statute.

However, Government Code section 15606 does not entrust SBE with discretion to promulgate a rule that conflicts with section 170 or any other property tax law that is within its purview to enforce. "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." (Gov. Code, § 11342.2.) And because the SBE's implied authority to interpret key terms in the property tax statutory scheme is an *interpretive* function, ultimately it is our job to decide whether a given interpretation is "consistent and not in conflict with" the operative statute.

Weighing against attributing considerable judicial deference to SBE's interpretation are the following: (1) its interpretation was not contemporaneous with the enactment of section 170; and (2) SBE has not historically and consistently maintained the interpretation codified in Rule 139[4] and indeed

---

[4] Airlines claim to the contrary that the SBE has historically construed section 170 to encompass diminished value due to restricted access and "[m]any" assessors have followed this lead. The question is not the construction of section 170 as a whole, but the particular construction given to section 170, subdivision (a)(2). (See pt. III.B., *post.*) The SBE letters and other documentation to which Airlines refer are directed to the board's discussion of section 170

the board has abandoned its adherence to that interpretation by not defending it on appeal. Weighing in favor of more deference is the fact that the promulgation of Rule 139 complied with all APA rulemaking procedures, including public notice and comment. Some, but not substantial, deference is due in this case.[5]

B. *Rule 139 is Not Consistent With Section 170, Subdivision (a)(2) or the Constitutional Provision that Section 170, Subdivision (a)(2) Implements.*

1. *Airlines' Plain Language Argument Does Not Hold.*

Airlines first insist that Rule 139 *is consistent with* the plain language of section 170, subdivision (a)(2), quoted above. Since the provision states that it applies to damage due to a "misfortune or calamity," they argue eligibility for reassessment thus is not restricted to *any particular type* of misfortune or calamity. Continuing in this vein, Airlines assert that the events of September 11, 2001, clearly constitute a misfortune or calamity as required by section 170, subdivision (a)(2). Therefore, because the language does not *forbid* reassessment as prescribed by Rule 139, we should construe the statute in a manner that effects the salutary purposes of affording taxpayers the remedy of reassessment due to a calamity or misfortune.

Airlines omit a key fact in this argument: The September 11, 2001 events did not occur in California and, other than the crashed aircraft which apparently were taxed in California but are not at issue here, no California property was physically damaged.

More to the point, Airlines' interpretation does not hold. The rules of statutory construction teach us that courts should ascertain the Legislature's intent so as to effect the purpose of the law in question. In fulfilling this rule, we look first to the language of the statute itself, considering that language in the context of the entire statute and statutory scheme. Further, we are called

---

generally or section 170, subdivision (a)(1), not section 170, subdivision (a)(2). Moreover, Airlines mention but a handful of assessors, out of 58. All but one is a respondent in this very lawsuit and the "evidence" that supposedly shows deference to their interpretation is considerably underwhelming.

[5] Airlines also argue that the trial court incorrectly ruled that section 170 announced an exemption from tax, such that any doubt as to its applicability would be resolved against the exemption. With this error they posit that the court's construction was wrong and must be ignored. Moreover, they maintain that section 170 is a remedial statute which we must construe liberally to achieve its purpose and protect the persons within its purview, citing *Booth v. Robinson* (1983) 147 Cal.App.3d 371, 378 [195 Cal.Rptr. 130]. We agree that section 170 is remedial. However, regardless of the remedial nature of the statute, we do not ignore the rules of statutory construction.

to give effect to statutes according to the ordinary, usual import of the language used in framing them. We construe words in their context, mindful of the nature and obvious purpose of the statute where they appear. (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [110 Cal.Rptr.2d 828, 28 P.3d 876].)

■ Section 170 spells out procedures for reassessment where there has been "damage or destruction to the property" brought about by a misfortune or calamity as delineated in section 170, subdivision (a)(1) through (3). The term "damage" as it appears in the lead-in to these subdivisions can be viewed as ambiguous in that it does not specify the type of damage for which relief is available. However, section 170 implements article XIII, section 15 of the California Constitution. The plain language of this constitutional provision permits reassessment where taxable property is "physically damaged or destroyed."[6] Statutes inconsistent with our Constitution are void. (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 602 [88 Cal.Rptr.2d 56, 981 P.2d 990].) It goes without saying that where possible, as it is here, we will construe statutes in favor of their validity. (*Turner v. Board of Trustees* (1976) 16 Cal.3d 818, 827 [129 Cal.Rptr. 443, 548 P.2d 1115].)

We are aware that the Constitutional Revision Task Force on Article XIII[7] as well as the ballot argument in favor of the proposition leading to enactment of the proposed revisions—including article XIII, section 15 of the California Constitution—indicated that the revisions were not intended to be substantive in nature. From this Airlines argue that section 15 took the meaning of the predecessor section 2.8, which did not explicitly require that the property be physically damaged. First, we do not consult legislative history where, as here, the language is clear and unambiguous. (*Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 96 [255 Cal.Rptr. 670, 767 P.2d 1148].) Second, rather than *ignoring* the insertion of the word "physical" and violating the admonition that we give significance, if possible, to every word, phrase and part of an enactment (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315]), we conclude that inclusion

---

[6] Although the trial court stated that Rule 139 "appears to expand the circumstances under which property taxes can be reassessed beyond that authorized by the Constitution," it declined to decide the constitutionality of the rule because it concluded Rule 139 improperly expanded the definition of "damage or destruction" beyond the bounds established in section 170. While we understand the trial court's reticence to decide the matter on constitutional grounds, ignoring the pyramid of authority which sandwiches section 170 between the constitutional base and the regulatory tip leads to an incomplete and stilted analysis.

We are also aware that the physical damage requirement of article XIII, section 15 of the California Constitution may raise questions regarding the constitutionality of section 170, subdivision (a)(1) and (3). The Assessors have not challenged those provisions and thus their validity is not before the court.

[7] 7 Assembly Journal (1973–1974 Reg. Sess.) pages 13237–13238, 13266.

of the term expressed the literal understanding and intent of the task force as it interpreted former section 2.8. In other words, physicality has *always* been a constitutional requirement, even when not explicitly stated. As explained by the legislative analyst in the very ballot argument to which Airlines refer us, one of the purposes of the proposition was to clarify wording. Insertion of the word "physical" did just that.

### 2. Direct Physical Damage is a Requirement of Section 170, Subdivision (a)(2) but Not of Subdivision (a)(1) and (3).

Moreover, looking to the whole of the statute and its purpose, it is clear the Legislature intended the qualifying damage to be physical damage. First, the one appellate court decision that has construed section 170 states that its overall objective "is to afford financial relief to the owners of property *physically damaged or destroyed* by an unforeseeable occurrence beyond their control." (*T. L. Enterprises, Inc. v. County of Los Angeles* (1989) 215 Cal.App.3d 876, 880 [263 Cal.Rptr. 772], italics added.) Second, looking to the context of the statute we observe that section 170, subdivision (g) states that "[t]he assessed value of the property *in its damaged condition* . . . shall be the taxable value of the property until it is restored, repaired, reconstructed . . . ." (Italics added.) Property cannot be restored, repaired or reconstructed unless it is physically damaged.

■ Nonetheless, we recognize that in section 170, subdivision (a)(1) and (3) the Legislature delineated two exceptions to the general meaning of "damage or destruction" as implying direct physical injury to the property, thereby providing limited relief for indirect physical damage. Thus, in subdivision (a)(1) the term "damage" includes diminution in value due to restricted access to the property, where the restricted access was caused by a major misfortune or calamity which spurred the Governor to proclaim the area to be in a state of disaster. Additionally, reassessment is available under subdivision (a)(3) for a possessory interest in government land where a misfortune or calamity has restricted access to that land. However, no expanded meaning is set forth in subdivision (a)(2). Where the Legislature carefully uses a term or phrase in one place but excludes it in another, we will not imply the term or phrase where excluded. (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 576 [273 Cal.Rptr. 584, 797 P.2d 608].) Further, where an exception to a general rule is specified by statute, we will not imply or presume other exceptions. (*Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 410 [267 Cal.Rptr. 589, 787 P.2d 996].) Here the Legislature provided for reassessment due to restricted

access in section 170, subdivision (a)(1) and (3), but not in subdivision (a)(2). Moreover, construing subdivision (a)(2) to apply in cases of restricted access would render mere surplusage the terms "restricted access" in subdivision (a)(1) and the "right to enter upon the land to be suspended or restricted" in subdivision (a)(3). We always seek to avoid a construction that renders some words surplusage. (*Estate of MacDonald* (1990) 51 Cal.3d 262, 269–270 [272 Cal.Rptr. 153].)

### 3. *Attorney General Opinions Do Not Help Airlines.*

Airlines also claim that the Attorney General has opined that section 170 applies to economic loss or damage caused by restricted physical access to property. Their argument is convoluted and wrong.

In 1972 the Attorney General construed former section 155.1, a predecessor to section 170, subdivision (a)(1) which, like the current statute, defined "damage" as including diminished value due to restricted access. (55 Ops.Cal.Atty.Gen. 412, 413 (1972); see Stats. 1970, ch. 963, § 2, pp. 1729–1731.) That opinion addressed the issue whether former section 155.1 allowed for reassessment of property that *was not physically damaged* and did not suffer impaired access but nonetheless experienced economic devaluation by reason of its location in the disaster area. The Attorney General concluded it did not encompass such devaluation. (55 Ops.Cal.Atty.Gen., *supra*, at p. 414.)

Three years later the Attorney General turned attention to former section 155.13, a predecessor of section 170, subdivision (a)(2), that also defined "damage" as encompassing diminished value resulting from restricted access. (58 Ops.Cal.Atty.Gen. 327, 328 (1975); see Stats. 1973, ch. 901, § 1, pp. 1675–1677.) The opinion noted, not surprisingly, that "the words 'damaged or destroyed' *as used in the comparably worded section 155.1* . . . does [*sic*] not encompass economic loss in the absence of physical injury." (58 Ops.Cal.Atty.Gen., *supra*, at p. 330, italics added.) Airlines seize on the italicized language to conclude that the 1975 opinion "effectively affirmed the 1972 opinion that damage under Section 170 includes economic damage caused by restricted physical access . . . ." Further, they exclaim as important the fact that the 1975 opinion "was written *after the 1974 amendment* which added the words 'physically damaged' to the Constitution."

We are stymied by this conclusion and statement. First, the 1975 opinion makes no such affirmation. Second, both opinions predate section 170, of

which subdivision (a)(2) thereof notably *does not* define damage to include diminished value resulting from restricted access. Third, the 1972 opinion specifically *declined* to pass on the constitutionality of the portion of former section 155.1 which allowed for reassessment in instances of restricted access. (55 Ops.Cal.Atty.Gen., *supra*, at p. 414, fn. 1.)

Fourth, the 1975 Attorney General opinion *was* published *after* article XIII, section 15 was added to the Constitution, and that provision, adopted November 5, 1974, does specifically refer to "taxable property *physically* damaged or destroyed." (Italics added.) However, the 1975 opinion actually speaks of a 1974 amendment *to article XIII, section 2.8,* which referred simply to taxable property that was "damaged or destroyed," without any qualifier. (58 Ops.Cal.Atty.Gen., *supra*, at p. 328.) Let us clear up the confusion. Former section 2.8 of article XIII was amended June 4, 1974, and repealed November 5, 1974, at the same time article XIII, section 15 was adopted. The drafter of the 1975 opinion had not kept pace with this change. Therefore, by no possible stretch can we rely on the 1975 opinion as affirming that damage under section 170 and its predecessors encompasses economic loss due to impeded access to the property, and that such construction is compatible with the physicality requirement of article XIII, section 15.

### 4. *Legislative History Does Not Aid Airlines.*

Airlines also delve into the legislative history of former section 155.13, a predecessor of section 170, subdivision (a)(2), in an attempt to persuade us of their interpretation. In particular, 1976 amendments to former section 155.13 eliminated the language that defined damage as including loss of value due to restricted access. (Stats. 1976, ch. 1388, §§ 2.5, 3.5, pp. 6294–6296, 6296–6297.) The history Airlines think is pertinent consists of a 1976 memorandum from the Contra Costa County Assessor to the county administrator stating, among other points, that the omitted language was redundant and unnecessary. This memorandum was attached to a letter from the county administrator to Assemblyman John T. Knox, the author of the relevant bill that was enacted but shortly thereafter superseded. These materials do not constitute cognizable legislative history. At most they reflect the individual views or understandings of Assemblyman Knox and two county officials. Nor is there any indication that the documents were made available or communicated to the Legislature as a whole. (*People v. Patterson* (1999) 72 Cal.App.4th 438, 443–444 [84 Cal.Rptr.2d 870]; see *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30, 39 [34 Cal.Rptr.3d 520].)

Airlines also offer as persuasive certain committee and SBE analyses, but only for the assertion that they failed to discuss the omitted language as one of the changes wrought by the amendment. This argument leads nowhere.

■■■■■■■■■■■■■■■

C. *Rule 139 Is Not Consistent with Section 170, Subdivision (a)(1) and in Any Event that Provision Does Not Apply to the Events of September 11, 2001.*

Airlines also argue that Rule 139 implements and is consistent with section 170, subdivision (a)(1), which allows for calamity reassessment *within a Governor-declared disaster area or region of this state.* The Governor is empowered to proclaim a state of emergency upon finding that "conditions of disaster *or* of extreme peril to the safety of persons and property within the state caused by [enumerated conditions]" exist. (Gov. Code, § 8558, subd. (b), italics added; see *id.* § 8625.) Thus the Governor can declare that a state of emergency exists either because of a disaster, on the one hand, or because of extreme peril, on the other hand.

■■■ As a general matter, Rule 139 cannot be justified as consistent with section 170, subdivision (a)(1) because the rule permits reassessment in the absence of physical damage, whether direct or, in the case of restricted access, indirect. (See 55 Ops.Cal.Atty.Gen., *supra,* at p. 414.) Moreover, as a specific matter and irrespective of the fit between Rule 139 and section 170, subdivision (a)(1), section 170, subdivision (a)(1) does not apply to the events of September 11, 2001, because the condition precedent of a Governor-declared state of disaster in a particular region or area of the state is absent.

On September 11, 2001, the Governor proclaimed a "State of Emergency" based on the finding "that conditions of extreme peril to the safety of persons and property exist within the State of California." The state of emergency was decreed for the specific purpose of permitting the Chair of the Judicial Council to invoke the provisions of Government Code section 68115, which permits the courts to exercise extraordinary powers with respect to court sessions and proceedings.

Significantly, the Governor did not declare a state of disaster. Additionally, the proclamation had nothing to do with damaged or destroyed property, let alone property tax relief. Indeed the proclamation was limited to an initial term of 10 days, which would not be the case had the Governor intended to declare a disaster in a region or area of the state necessitating provisions for property tax relief. In short, section 170, subdivision (a) does not apply.

## IV. CONCLUSION; DISPOSITION

The SBE's effort to expand calamity reassessment relief beyond the requirement of direct physicality embedded in the Constitution and section 170, subdivision (a)(2) is invalid. Moreover, Airlines have asked us to sanction relief based on restricted access in the absence of *any* physical damage in California. Such relief has never been available under section 170 and its predecessors. Therefore, the judgment in favor of the Assessors is affirmed.

Sepulveda, J., and Munter, J.,[*] concurred.

---

[*]Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.