[No. A134047. First Dist., Div. Four. Dec. 12, 2012.]

DEBORAH EDGERLY, Plaintiff and Appellant, v.
CITY OF OAKLAND, Defendant and Respondent.

**COUNSEL**

Scott Law Firm, John Houston Scott and Lizabeth N. de Vries for Plaintiff and Appellant.

Randolph W. Hall, Chief Assistant City Attorney; Foster Employment Law, Michael William Foster and Jill A. Sprague for Defendant and Respondent.

Colantuono & Levin, Sandra J. Levin, Tiana Joi Murillo; Porter Scott, Stephen E. Horan and Thomas L. Riordan for League of California Cities as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**BASKIN, J.**[*]—Deborah Edgerly is the former city administrator of the City of Oakland (City). Edgerly sued the City in 2009, alleging that then Mayor Ron Dellums (Mayor or Dellums) wrongfully terminated Edgerly's employment in retaliation for her refusal to violate the City's charter, municipal code, and civil service rules and resolutions.[1]

Edgerly claims that the trial court erred when it sustained a demurrer to the first two of her three causes of action for violation of the statewide whistleblower statute set forth in Labor Code section 1102.5, subdivision (c) (section 1102.5(c)).[2] Edgerly also claims that the trial court erred when it dismissed the third whistleblower cause of action on a motion for summary adjudication.

The primary question presented by this appeal is a question of first impression under California law: Should alleged violations of a charter city's *municipal* law be deemed violations of *state* law for purposes of section 1102.5(c)? Based on principles of statutory construction and public policy considerations, we hold that they should not, and accordingly, we affirm.

### I.

### PROCEDURAL BACKGROUND

#### A. *Procedural History.*

On July 6, 2009, Edgerly filed a complaint alleging three causes of action for retaliation under the whistleblower statute, and one cause of action for gender discrimination under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) The City filed a general demurrer to all three of the whistleblower causes of action.

---

[*] Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] We take judicial notice of the City charter, together with the various regulations and legislative enactments relied on by the parties. (Evid. Code, §§ 451, 452.)

[2] All statutory references are to the Labor Code, unless otherwise stated.

The trial court sustained the demurrer with leave to amend as to the first two causes of action, on the ground Edgerly did not identify any violation of state law. The trial court overruled the demurrer as to the third whistleblower cause of action, which alleged a violation of Government Code section 87100.

Edgerly filed a first amended complaint (FAC), and the City again demurred to all three whistleblower causes of action. This time, the trial court sustained the City's demurrer to the first and second causes of action without leave to amend.

In these first two causes of action, Edgerly alleged that she was terminated in retaliation for her refusal to agree to the Mayor's violations of the City charter. The trial court ruled that Edgerly did not show the misconduct "would result in a violation of a state statute, rule or regulation." The trial court again overruled the demurrer as to the third cause of action, that Edgerly alleged a violation of a state statute—Government Code section 87100.

While the third whistleblower cause of action survived demurrer, the trial court later granted the City's motion for summary adjudication of that cause of action because Edgerly failed to produce evidence showing that a state statute was violated. A jury trial on Edgerly's remaining (fourth) cause of action for gender discrimination resulted in a verdict in the City's favor. This appeal followed.[3]

B. *Plaintiff's Allegations.*

The factual allegations of Edgerly's declaration opposing the summary adjudication motion are fully consistent with the allegations of the FAC. To avoid duplication, we do not separately set forth the ultimate facts recited in that pleading. The following facts are taken from Edgerly's opposition declaration or from matters of which we have taken judicial notice.

Edgerly served as the City's finance director from 1997 until 2003. In 2003, then Mayor Jerry Brown appointed her as city manager. Following a revision to the charter, the position of city manager was renamed city administrator in 2004. Pursuant to the City charter, the city administrator served at the pleasure of the mayor and could be discharged at any time, for any reason. (Oakland City Charter, § 305(e) (Charter).)

---

[3] Edgerly does not appeal from that part of the judgment relating to the jury verdict in favor of the City regarding the FEHA claim for gender discrimination.

As city administrator, it was part of Edgerly's job duties to (1) designate, appoint, discipline, or remove directors, department heads, or assistants (Charter, §§ 502–503); (2) execute all City laws and ordinances (Charter, § 504, subd. (a)); and (3) control and administer the financial affairs of the City (Charter, § 504, subd. (e)). Specifically, as city administrator, Edgerly had authority over various City departments and personnel, including the police department. She was also responsible for the City's budget and expenditures. If Edgerly had any concerns about the allocation of City funds, she would confer with the city attorney's office.

In 2007, Dellums replaced Brown as Mayor of the City. Knowing that the new Mayor could replace her at any time, Edgerly developed an exit plan.

In October 2007, Edgerly gave notice of her planned retirement set for July 31, 2008. The Mayor agreed to this retirement date. However, on June 27, 2008, a little over a month before the planned retirement date, the Mayor placed Edgerly on administrative leave. The Mayor terminated Edgerly's employment on July 1, 2008, effective immediately. Edgerly claimed she was wrongfully terminated as a whistleblower because the Mayor asked her to violate several provisions of the City's charter, which she refused to do.

In the course of carrying out her duties as city administrator under Dellums, Edgerly questioned several expense reimbursement requests. These included requests regarding the Mayor's personal expenditures, including payment of a cellular phone bill for the Mayor's wife, overtime pay for the Mayor's driver, and increased utility costs associated with security upgrades at the Mayor's residence.

Edgerly did not know if the Mayor was aware of the questions about the cellular phone bill; she also could not recall if there had been any investigation regarding this reimbursement request. Ultimately, Edgerly approved payment of this request in April 2008, and it was decided that the cellular phone in the Mayor's wife's name, which previously had been in the Mayor's name, would be returned to his name going forward.

As for the overtime pay for the Mayor's driver, Edgerly was unaware whether anyone ever told the Mayor that there was an issue about whether the overtime could be charged if the driver was driving Mrs. Dellums as opposed to the Mayor. Edgerly approved the overtime payment for the driver and advised the Mayor's office that future overtime bills needed to be for driving the Mayor, not his wife.

With respect to the reimbursement request for the utility bills, Edgerly sought an opinion from the city attorney's office regarding whether such a reimbursement was permissible. Edgerly could not recall receiving any direction from the city attorney on this issue. Nevertheless, Edgerly testified that she told the Mayor that she could not reimburse this request. She could not, however, remember what, if anything, the Mayor said in response when she advised him that she could not reimburse him for the utility bill. According to the Mayor's deposition testimony, he decided ultimately to drop the request.

Edgerly also fielded requests from the Mayor's chief of staff and Mrs. Dellums, who sought office space and computers for a public-private partnership initiative supported by the Mayor. Suitable space was not located during Edgerly's tenure.

According to Edgerly, the Mayor attempted unilaterally to enter into a $150,000 service contract with former City Manager Robert Bobb, without seeking the requisite authorization from the city council. Edgerly sought the assistance of the city attorney to explain to the Mayor that his actions were improper. Once advised of the necessity that contracts in excess of $100,000 required a competitive bidding process and approval from the city council, the Mayor directed Edgerly to prepare a request for proposals to obtain the bids.

Edgerly claims the Mayor attempted to usurp her authority by directing department and agency heads to report directly to him rather than to her. Edgerly states that she opposed this. Edgerly claims she also refused requests to terminate department heads and other high level executive officials so that the Mayor could reward his campaign supporters with City jobs.

On June 7, 2008, Edgerly's nephew was involved in a police incident. Edgerly intervened with the police. When she identified her office and sought explanations, her actions became public and controversial. As a result, the Mayor directed Edgerly to work solely on the competitive bidding process for the Bobb service contract, because the Mayor saw the police incident with Edgerly and her nephew as a distraction, creating the appearance of a conflict of interest.

On June 25, 2008, the Mayor believed that Edgerly had agreed to step back from her involvement with the police department and asked her to sign documents ceding control of the police department to the interim director of

the Community and Economic Development Agency. She, however, refused to appoint the Mayor's designee. The Mayor wanted to place Edgerly on administrative leave on June 26, 2008. On Friday, June 27, the Mayor attempted unsuccessfully to communicate with Edgerly (she was away at a funeral) to tell her he was placing her on administrative leave.

On July 1, 2008, the Mayor terminated Edgerly's employment effective immediately because he believed he could not wait for her to communicate with him, and a decision was required.

## II.

### DISCUSSION

### A. *The Standard of Review.*

"Our review of the sufficiency of a complaint against a general demurrer, which is de novo, is guided by long-settled rules. ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] . . . .' (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)" (*Fonseca v. Fong* (2008) 167 Cal.App.4th 922, 929 [84 Cal.Rptr.3d 567].) In addition, we consider the complaint's exhibits. (*Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 400 [102 Cal.Rptr.3d 72].) "Under the doctrine of truthful pleading, the courts 'will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed.' [Citation.] 'False allegations of fact, inconsistent with annexed documentary exhibits [citation] or contrary to facts judicially noticed [citation], may be disregarded . . . .' [Citations.]" (*Ibid.*)

" 'Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]' (*Blank v. Kirwan*[, *supra*,] 39 Cal.3d [at p.] 318 . . . .)" (*Fonseca v. Fong, supra*, 167 Cal.App.4th at p. 929.)

B. *Section 1102.5.*

In 1984, the Legislature added the "Whistleblower Protection Statute" to the Labor Code by adopting section 1102.5. This section prohibits employers from retaliating against an employee "for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (§ 1102.5(c).)

■ The purpose of section 1102.5(c) is "to ' "encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation." ' [Citation.]" (*Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1546 [90 Cal.Rptr.3d 381] (*Hansen*).) Protected employees include "any individual employed by the state or any subdivision thereof, any county, city, city and county, including any charter city or county, and any school district, community college district, municipal or public corporation, political subdivision, or the University of California." (§ 1106.) In contrast to an employee of a private employer, a plaintiff employed by a governmental agency (such as Edgerly) does not need to inform another governmental agency of the unlawful acts in order to qualify for whistleblower protection. (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1312–1313 [130 Cal.Rptr.2d 347].)

■ To prove a cause of action under section 1102.5, the plaintiff must establish a prima facie case of retaliation. (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 138 [68 Cal.Rptr.3d 568].) If the defendant then proves there was a legitimate, nonretaliatory explanation for its acts, the plaintiff must demonstrate that this explanation is merely a pretext for retaliation. (*Ibid.*)

As we shall explain, Edgerly is unable to establish a prima facie case of retaliation. "To establish a prima facie case for whistleblower liability, a plaintiff must show that he or she was subjected to adverse employment action after engaging in protected activity and that there was a causal connection between the two. [Citation.]" (*Hansen, supra,* 171 Cal.App.4th at p. 1546.) Protected activity is the disclosure of or opposition to "a violation of *state* or federal *statute*, or a violation or noncompliance with a *state* or federal rule or *regulation.*" (§ 1102.5, subds. (b) & (c), italics added.) In other words, "[s]ection 1102.5 of the Labor Code requires that to come within its provisions, the activity disclosed by an employee must violate a federal or state law, rule or regulation. [Citation.]" (*Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809, 821–822 [98 Cal.Rptr.3d 281] (*Mueller*).)

C. *The Trial Court Properly Sustained the City's Demurrer.*

In sustaining the second demurrer to the first cause of action without leave to amend, the trial court determined that Edgerly's complaint relied solely on

the Charter, Oakland municipal ordinances, city civil service rules and procedures, and city personnel manual. The trial court further determined that none of these municipal law provisions should be deemed a state statute or regulation for purposes of section 1102.5(c). In sustaining the second demurrer to the second cause of action, the trial court determined that insufficient facts were alleged to identify a violation of a state statute. We agree with the trial court's reasoning and affirm the trial court's decision.

Edgerly challenges the trial court's rationale, arguing that her refusal to violate the City Charter, municipal code, and civil service rules and regulations is within the purview of section 1102.5(c). Edgerly's theory is simple: All local laws (like the City Charter and the civil service rules) have the force and effect of state laws. Thus, when the Mayor allegedly violated any charter provision or other local ordinance or rule, the Mayor also violated state statutes or state regulations. Similarly, whenever Edgerly refused to violate the Charter or local ordinances or rules, any act of retaliation because of this refusal is also an act of retaliation in violation of section 1102.5.

The City's argument is equally simple: The City Charter, municipal laws, and local civil service rules and procedures and personnel manual are local laws, which do not rise to the level of a statewide statute or regulation within the meaning of section 1102.5(c). Therefore, Edgerly cannot show that her refusal to do what the Mayor allegedly asked of her "would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (§ 1102.5(c); see *id.*, subds. (a), (b) & (c).)

■ This appeal requires us to interpret the scope of section 1102.5 to determine if it encompasses local laws enacted by charter cities. In so doing, "[o]ur task is a familiar one. 'We apply well-established principles of statutory construction in seeking "to determine the Legislature's intent in enacting the statute, ' "so that we may adopt the construction that best effectuates the purpose of the law." ' " [Citations.] We begin with the statutory language because it is generally the most reliable indication of legislative intent. [Citation.] If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]' [Citation.] We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations. [Citation.]" (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888 [80 Cal.Rptr.3d 690, 188 P.3d 629].)

■ Here, the plain language of section 1102.5 provides that it applies to "a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (*Id.*, subds. (a), (b) & (c).) Based on the unambiguous statutory language, we presume that the Legislature meant what

it said—section 1102.5 pertains, as relevant here, to state statutes, rules, or regulations. (*Miklosy v. Regents of University of California, supra*, 44 Cal.4th at p. 888.)

▮ That the Legislature chose to omit references to "local laws" when drafting section 1102.5 is readily apparent from its inclusion of "local laws" in the language of other whistleblower statutes.[4] For example, both Education Code section 44112, subdivision (b) and Government Code section 8547.2, subdivision (b) provide that an employer may not retaliate against an employee who refuses an illegal order, which is a "directive to violate or assist in violating a federal, state, or local law . . . ." (See Gov. Code, § 53087.6, subd. (f)(2) [providing a whistleblower hotline for activities "in violation of any local, state, or federal law"].) "Where the Legislature carefully uses a term or phrase in one place but excludes it in another, we will not imply the term or phrase where excluded. [Citation.]" (*Slocum v. State Bd. of Equalization* (2005) 134 Cal.App.4th 969, 978 [36 Cal.Rptr.3d 627].) Therefore, in this instance, the omission of the term "local laws" is indicative of legislative intent to exclude such laws from the purview of section 1102.5. Edgerly's argument that section 1106 specifically refers to charter cities does nothing to alter the conclusion that local laws are not within the ambit of section 1102.5. There is no question that section 1102.5 applies to charter city employees when the retaliation involves activities that violate a state statute or rule. Here, however, Edgerly's section 1102.5 claim is premised on purported violations of *local laws*. Moreover, there is nothing in the City Charter, ordinances, or rules that even suggests these have the effect of state statutes. Edgerly's argument that these municipal matters must be construed as state statutes strains logic and offends yet another rule of construction: city powers are strictly construed. (*City of Madera v. Black* (1919) 181 Cal. 306, 312 [184 P. 397].) For example, it is the general rule of municipal law that local governments cannot pass laws that apply outside of their boundaries. (*Harden v. Superior Court* (1955) 44 Cal.2d 630, 642 [284 P.2d 9].) It follows that municipal statutes do not qualify as state statutes within the scope of §1102.5(c) unless there is some enabling provision, for example, a municipal statute or rule stating that the intent of the city is to have its local laws treated as statewide statutes for purposes of this section. Edgerly relies on *Cawdrey v. City of Redondo Beach* (1993) 15 Cal.App.4th 1212, 1223 [19 Cal.Rptr.2d 179] for the notion that a "charter constitutes state law for that municipality." However, *Cawdrey* is a case dealing with the home rule doctrine and, as we show below, using the home rule doctrine affirms that municipal laws are not automatically state statutes within the scope of section 1102.5(c).

---

[4] Additionally, a search of the California Codes reveals that, outside of the whistleblower context, the Legislature has referred specifically to "local laws" in a variety of contexts in over 200 code sections. (See, e.g., Health & Saf. Code, § 25264; Civ. Code, § 798.16; Pub. Resources Code, § 21083.8.1; Health & Saf. Code, § 108921; Pub. Util. Code, § 387.6.)

As noted above, this appeal would appear to present a question of first impression. There is analogous case law however, dealing more generally with the question of when personnel decisions are actionable under section 1102.5(c), and this analogous case law does not support Edgerly's theory.[5]

For example, in *Mueller, supra*, 176 Cal.App.4th 809, a firefighter brought suit against the county, alleging that he had been retaliated against after expressing disapproval of a decision to transfer two firefighters in the department to another division. (*Id.* at p. 812.) There, the plaintiff asserted that "the Labor Code only requires that the employee have reasonable cause to believe that the information he discloses to a government . . . agency discloses a violation of such statute, rule or regulation . . . ." (*Id.* at p. 822, italics omitted.) Rejecting this assertion, the court concluded that the plaintiff's claims "[did] not rise to the level of whistleblower retaliation. Matters such as transferring employees, writing up employees, and counseling employees are personnel matters." (*Ibid.*) In so holding, the court explained that "[s]ection 1102.5 of the Labor Code requires that to come within its provisions, the activity disclosed by an employee must violate a federal or state law, rule or regulation. [Citation] . . . [T]his case is not about perceived violations of federal or state statutes, rules or regulations but rather about perceived violations of the department's own policies which are *local policies.*" (*Mueller*, at pp. 821–822, italics added).

Similarly, in *Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922 [56 Cal.Rptr.3d 262], a probationary high school teacher and basketball coach sued for wrongful termination after the district refused to renew his contract. (*Id.* at p. 925.) The teacher alleged, among other things, that he had " ' "blow[n] the whistle" ' " by complaining to the school's athletic director that another coach had recommended a protein shake to a student that had made the student sick. (*Id.* at p. 933, fn. 13.) The court held that such conduct was not protected by section 1102.5 because the disclosure did not involve a violation of any federal or state statute, rule, or regulation. (*Carter, supra*, at p. 933.) As the court explained, "Carter's disclosure here was not whistleblowing under section 1102.5, but rather a routine 'internal personnel disclosure' that was, at its core, a disagreement between the football and basketball coaches about the proper advice to give to student athletes. This type of disclosure is not encompassed by section 1102.5 . . . ." (*Id.* at p. 934.)

Further, in *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1381–1382 [37 Cal.Rptr.3d 113] (*Patten*), a principal sued a school district for whistleblower retaliation for disclosing improprieties at

---

[5] No party cites, and we have not found, any case holding that violations of a local charter by an official are automatically also violations of a state statute or law.

her school. In particular, she alleged she made four separate whistleblower disclosures, for which she received adverse employment action: (1) disclosing to a state senator that her school had engaged in budgetary improprieties by reassigning funds that were earmarked by the state for a certain purpose to another educational program; (2) disclosing accusations to her district superiors that a male physical education teacher was peering into the girls' locker room; (3) disclosing to her superiors certain off-color remarks made by a male science teacher; and (4) requesting additional staff to keep the campus safe. (*Id.* at p. 1382.)

The court held that except for the budgetary disclosure, the disclosures concerning teachers' conduct and lack of staff "do not rise to the level of blowing a whistle" but were made in "the context of an internal personnel matter based on a student complaint, rather than in the context of a legal violation." (*Patten, supra*, 134 Cal.App.4th at p. 1385.) The court explained that the disclosures involving the two teachers did not amount to whistleblowing because "although the disclosures were made by a government employee . . . to a government agency . . . , the disclosures indisputably encompassed only the context of internal personnel matters involving a supervisor and her employee, rather than the disclosure of a legal violation." (*Id.* at pp. 1384–1385, italics omitted.) Additionally, the court held that the plaintiff's disclosures to her superiors "about needing more staff" did not amount to whistleblowing "as a matter of law. Again, these disclosures were made in an exclusively internal administrative context. They do not show any belief on Patten's part that she was disclosing a violation of state or federal law in any sort of whistleblowing context, as required for a section 1102.5(b) whistleblowing action." (*Id.* at p. 1385.)

Despite these decisions, Edgerly argues that differentiating between local laws and state laws is contrary to the Legislature's overarching intent to foster a broad public policy goal of "encouraging workplace [(municipal)] whistle-blowers to report unlawful acts without fearing retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) We conclude, to the contrary, that strong public policy considerations militate against adopting Edgerly's interpretation of section 1102.5(c).

We begin by noting that it was part of Edgerly's general job description to take the actions that she alleged she took to enforce Oakland's municipal laws. Taken to its logical conclusion, Edgerly's argument is that as she routinely acted on each city official's expense reimbursement requests, each rejection constituted a per se violation of section 1102.5(c), no matter how trivial or routine each rejection was. This interpretation strains logic and, if adopted, could have a serious impact on the workings of the City and other charter cities. As *Patten, supra*, 134 Cal.App.4th 1378 instructs, "it would

thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site. [Citation.]" (*Id.* at p. 1385.) The court explained that "[t]o exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief." (*Ibid.*)

Similarly, here, there is no reason to micromanage the employment practices of a charter city, which is "specifically authorized by our state Constitution to govern [itself], free of state legislative intrusion, as to those matters deemed municipal affairs. Article XI, section 5, subdivision (a) of the California Constitution provides: 'It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations *in respect to municipal affairs*, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and *with respect to municipal affairs* shall supersede all laws inconsistent therewith.' (Italics added.)" (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555 [143 Cal.Rptr.3d 529, 279 P.3d 1022] (*City of Vista*). This provision, the roots of which trace back more than 100 years, is known as the home rule doctrine. (*Ibid.*)

The home rule doctrine was " 'enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.' (*Fragley v. Phelan* (1899) 126 Cal. 383, 387 [58 P. 923] (lead opn. by Garoutte, J.)" (*City of Vista, supra*, 54 Cal.4th at p. 556.) For example, our Supreme Court long ago held that the salaries of charter city employees are a municipal affair and not a statewide concern regardless of any possible economic effect those salaries might have beyond the borders of the city. (*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 316–317 [152 Cal.Rptr. 903, 591 P.2d 1].) Recently, in *City of Vista, supra*, 54 Cal.4th 547, the Supreme Court concluded that a charter city was not required to comply with the state prevailing wage law in the construction of its public works projects because the wage levels "are a municipal affair (that is, exempt from state regulation), and that these wage levels are not a statewide concern (that is, subject to state legislative control)." (*Id.* at p. 556.)

If salaries and wage levels are municipal affairs, then surely the manner in which a charter city enforces its own charter and local rules and ordinances constitutes a municipal affair and cannot be considered a statewide concern.

■ Accordingly, the perceived violations of the City's charter and local rules and ordinances allegedly requested of Edgerly are not within the purview of section 1102.5, and her whistleblower claim fails as a matter of law. We conclude Edgerly's claims are neither supported by the plain language of section 1102.5 nor the public policy considerations of that statute. Thus, the sustaining of the City's demurrer without leave to amend was not error.

### D. *The Trial Court Properly Granted Summary Adjudication.*

#### 1. *The Standard of Review.*

"A motion for summary judgment shall be granted if all the evidentiary papers submitted, which we review independently, show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. We do not resolve factual issues but ascertain whether there are any to resolve. (Code Civ. Proc., § 437c, subd. (c); [citations].) [¶] A defendant 'may move for summary judgment in any action or proceeding if it is contended that the action has no merit." (Code Civ. Proc., § 437c, subd. (a).) A cause of action has no merit if it is shown that the plaintiff cannot establish one of the action's elements. (Code Civ. Proc., § 437c, subd. (*o*)(1); *Rio Linda Unified School Dist. v. Superior Court* (1997) 52 Cal.App.4th 732, 735 [60 Cal.Rptr.2d 710].) [¶] Because a summary judgment denies the losing party a trial, we liberally construe the evidence in support of that party and resolve doubts concerning the evidence in that party's favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]; *Colores[ v. Board of Trustees,]* *supra*, 105 Cal.App.4th at p. 1305.)" (*Patten, supra,* 134 Cal.App.4th at pp. 1383–1384, italics added.)

#### 2. *Discussion.*

In order to establish a prima facie case of retaliation, Edgerly must show (1) she engaged in a protected activity, (2) the City subjected her to an adverse employment action, and (3) there is a causal link between the two. (*Hansen, supra,* 171 Cal.App.4th at p. 1546.) In granting summary adjudication of the third whistleblower cause of action, the trial court ruled that Edgerly had failed to make a prima facie showing.

Edgerly claims this was error insofar as it related to her section 1102.5(c) claim based on Government Code section 87100 violations. Government Code section 87100 prohibits a public official from using his official position to

"influence a governmental decision" in which he has a financial interest.[6] Edgerly argues that three reimbursement requests violated Government Code section 87100: (1) an alleged overtime payment to the Mayor's driver for driving Mrs. Dellums; (2) an alleged cellular phone bill in Mrs. Dellums's name; and (3) the alleged increased utility expense at the Mayor's residence.

█ Pursuant to Government Code section 87103, "[a] public official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official, [or on] a member of his or her immediate family . . . ." The regulations interpreting the statute clarify that reimbursements of expenses are specifically excluded from the definition of "material financial effect." "The financial effects of a decision which affects only the salary, per diem, or *reimbursement for expenses the public official or a member of his or her immediate family* receives from a federal, state or local government *agency shall not be deemed material.* . . ." (Cal. Code Regs., tit. 2, § 18705.5, subd. (b), italics added.)

Edgerly failed to address this issue in her opposition to the City's summary judgment motion, and on appeal she all but ignores the fact that requests for reimbursement of expenses are excluded under the statute's interpretative regulations. Instead, she maintains that she engaged in protected activity because she had a good faith, reasonable belief that the Mayor's requests violated Government Code section 87100. Reasonableness is generally a question of fact to be resolved by a jury. (*Terry v. Atlantic Richfield Co.* (1977) 72 Cal.App.3d 962, 966 [140 Cal.Rptr. 510].) Here, however, Edgerly's argument misses the point that the challenged reimbursements violated no state law. (See Cal. Code Regs., tit. 2, § 18705.5, subd. (b).)

Moreover, the evidence shows that Edgerly actually approved two of the three requests and referred the third request to the city attorney's office. There is no evidence that she told anyone she believed that the Mayor's requests violated any statutes. As set forth above, Edgerly paid the overtime for the Mayor's driver. At most, the record reflects that she admonished the Mayor's office that future driver's bills should be for driving the Mayor only. She also approved payment of the cellular phone bill. None of these actions constituted a refusal to participate in any alleged violations of Government Code section 87100.

---

[6] Government Code section 87100 provides: "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

To the extent Edgerly maintains that she refused the reimbursement requests, her refusals to participate in the Mayor's alleged misconduct were consistent with, if not required by, her general job description and duties, activities she now claims are protected under section 1102.5(c). (See Charter, § 504.) Although there are no California cases directly on point, several federal cases present similar issues. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089] [noting that due to similarities between state and federal employment discrimination law, Cal. courts look to federal precedents where applying their own statutes].)

 For example, in *McKenzie v. Renberg's Inc.* (10th Cir. 1996) 94 F.3d 1478, 1487, the Tenth Circuit concluded that if the claimed whistleblowing activities fall within general duties, they are not actionable. There, the court held that an employee's actions in connection with an overtime pay issue were not protected because the actions "were completely consistent with her duties as personnel director . . . to evaluate wage and hour issues and to assist the company in complying with its obligations . . . ." (*Ibid.*)

Similarly, in a more recent case out of the District Court for the Northern District of California, the plaintiff, a division manager responsible for holding employees accountable and ensuring compliance with legal requirements, was unable to sustain her whistleblower claim under section 1102.5 because notifying the company of suspected falsification of employee timecards was part of her job duties. (*Muniz v. United Parcel Service, Inc.* (N.D.Cal. 2010) 731 F.Supp.2d 961, 970.)

So too here, Edgerly, who was in a special position as an administrator, has not shown that a single activity fell outside her general work involvement. (See, e.g., *Correa v. Mana Products, Inc.* (E.D.N.Y. 2008) 550 F.Supp.2d 319, 330 ["In order for employees in human resources positions to claim retaliation they need to first clearly establish that they were engaged in protected activities other than the general work involved in their employment."].)

We conclude that Edgerly has failed to raise a triable issue of material fact supporting her claim that she engaged in protected activity. Accordingly, the trial court properly granted summary judgment, as Edgerly was unable to establish all of the elements of her retaliation claim.[7]

---

[7] By reason of this holding, we need not reach the other issues relating to Edgerly's retaliation claim raised by this appeal.

## III.

### Disposition

The judgment is affirmed. City shall recover its costs.

Reardon, Acting P. J., and Rivera, J., concurred.

On December 13, 2012, the opinion was modified to read as printed above.