Filed 3/24/16  Zelaya v. RMI International CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OSMAR ZELAYA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>RMI INTERNATIONAL, INC.,<br><br>    Defendant and Respondent. | B251191<br><br>(Los Angeles County<br>Super. Ct. No. BC480430) |

        APPEAL from a judgment of the Superior Court of Los Angeles County,
Michael Stern, Judge.  Affirmed.

        Rehm & Rogari and Ralph Rogari for Plaintiff and Appellant.

        Gordon & Rees, Steve Ronk, Stephanie Alexander and Erika Shao for Defendant
and Respondent.

Plaintiff and appellant Osmar Zelaya appeals the judgment entered after a jury verdict in favor of his former employer, defendant and respondent RMI International, Inc. (RMI) on claims of retaliatory discharge in violation of Labor Code section 1102.5 and retaliatory discharge in violation of public policy. Zelaya contends the trial court committed several instructional errors and improperly excluded the testimony of one of his witnesses, and the special verdict form was defective. Discerning no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Zelaya's employment with RMI*

RMI is a minority-owned security services company. In September 2008, RMI contracted with the Los Angeles County Metropolitan Transportation Authority (MTA) to provide security services for a three-year term. RMI also provided security services for the Department of Water and Power (DWP).

Beginning in 1992, Zelaya worked as a security officer for predecessor companies who provided security for the MTA. When RMI took over the MTA contract in 2008, it hired Zelaya as a lead supervisor on the MTA account. Zelaya's duties included inspecting approximately 15 to 20 guard posts, ensuring that security officers were properly performing their duties, inspecting RMI vehicles, and ensuring paperwork was properly completed, including time sheets and daily activity reports.

Zelaya reported to Milton Beltran, the operations manager and MTA account manager. After RMI terminated Beltran's employment in September 2010, Paul Teuerle replaced Beltran and Chris Conger became the MTA assistant account manager. At all relevant times, company founder Richard Rodriguez was RMI's president, Richard Aparicio was the human resources coordinator, and Shahar Gaash and Clarence Rochell were RMI vice presidents.

2. *The MTA account*

RMI provided three types of security officers on the MTA account. Security guards, both armed and unarmed, "stood post," generally in "guard shacks" at fixed

2

locations. "Zone patrol" officers were assistant supervisors who drove company vehicles, patrolling parking lots and other areas at the various rail stations to prevent vandalism or property damage. Lead supervisors checked the guard posts to ensure officers were performing their duties. The MTA contract specified the number of posts to be covered, the number of vehicles to be provided, the number of hours that should be performed at each location, and the rate that would be applied for that location.

It is common in the security industry to have "call-offs," i.e., personnel failing to arrive to cover a shift due to illness, an emergency, or other reasons. Supervisors were required to ensure posts were filled and shifts covered in the event of call-offs. On occasion, zone patrol officers or supervisors filled in to cover fixed guard posts when a guard was unavailable to cover a shift. While a zone patrol officer was covering a standing post due to a call-off, the zone patrol officer was unable to use the RMI vehicle to drive to and supervise other posts.

The MTA was billed per location, not per guard. RMI witnesses acknowledged it would be improper to charge the MTA the supervisor rate if the supervisor was actually performing guard services at a fixed post. It would also be improper to "double bill" the MTA by charging for both the supervisor's time and the guard's time if a single supervisor was filling a guard's shift. However, when a supervisor covered a guard post, his or her time was actually billed at the guard rate, not the supervisor rate, and the client would not be double billed if the supervisor covered a fixed post.

It was commonplace for the same employee to work shifts for more than one contract. Thus, an officer assigned to cover an MTA post on one occasion could be sent to cover a DWP post at a different time. It would also be improper to have an employee perform services on the DWP contract but charge the MTA for his or her time. This did not occur because separate bills were prepared and the appropriate client was billed for the time.

3

Vehicles were charged on a flat rate basis, rather than an hourly or per use rate. Thus, the MTA was charged the same amount for the vehicle regardless of whether the supervisor was performing supervisory services or guard services.

RMI's controller, Elena Rabinovich, testified regarding RMI's billing procedures and explained how the billing system protected against overbilling. Zelaya had no access to the billing or accounting systems and never reviewed final bills. No one ever informed Rabinovich that RMI was submitting fraudulent or improper bills to the MTA.

3. *Zelaya's complaints about staffing or billing*

a. *Conversations with Pu, Rochell, and Gaash*

At some point while either Beltran or his predecessor was the MTA account manager, Zelaya spoke with MTA Sergeant Yi Pu regarding RMI's overuse of zone patrol officers to cover call-offs. Zelaya spoke to Rochell, who relayed the information to Gaash. As a result, Gaash told supervisors that zone patrol officers could temporarily cover call-offs but had to find a replacement officer as soon as possible. Gaash was pleased Zelaya had brought the issue to his attention; this was part of Zelaya's job.

According to Zelaya, Pu asked him again in February 2011 about the issue of using zone patrol officers to cover open posts. Zelaya told Pu that the problem was still occurring, and requested that Pu " 'tell [his] boss to fix the problem.' " When he talked to Pu, Zelaya thought he was disclosing a problem with overbilling, because RMI was using one officer to cover two locations. Pu told Zelaya to talk to his boss. Zelaya informed Rochell of the conversation.

Gaash testified that Zelaya never told him the MTA was being improperly billed.

Sergeant Pu, called as a witness for plaintiff, testified that Zelaya never told Pu that RMI was "fraudulently billing [MTA] in any way."

b. *Zelaya's other testimony about complaints*

Zelaya additionally testified as follows. After Teuerle and Conger became the MTA account manager and assistant manager, respectively, he began to suspect there were problems with the way they were billing the MTA. He believed they were

4

improperly using zone patrol officers to cover guard posts. When he told Teuerle of his concerns, Teuerle said the company was short staffed. According to Zelaya, the MTA did not mind if supervisors or zone patrol officers covered guard posts occasionally when there was an emergency, but "we was abusing, you know, every week." Teuerle assured Zelaya he would take care of the problem.

Zelaya told Teuerle about billing problems. Zelaya noticed instances in which one employee was signing in to two posts. He had seen time sheets in which a supervisor who covered an open post signed both the time sheet for his own supervisor post and for the fixed post he covered. He saw that Conger "was putting all the hours, inputting the information from the time sheet, I saw him many times, he don't subtract . . . the hours." When Zelaya told Conger he had to subtract the hours, Conger told him, " 'Zelaya, keep your mouth shut. You don't see nothing. We busy right now. We have to do it like that.' " Zelaya again spoke to Teuerle, stating: " 'if we send all these hours, you know, you will overbill it to M.T.A.' " Teuerle replied that he knew what he was doing. Zelaya brought this issue up in October 2010, November 2010, December 2010, and January 2011.

Zelaya also noticed that a supervisor on the MTA account had covered a DWP account. Zelaya informed Teuerle and Conger, stating: "it is against the law what we are doing right now," because "they was charging to M.T.A. when we was . . . on another site." RMI also ordered Zelaya to perform vehicle inspections on DWP contract vehicles "[m]any times." When he told Teuerle this was wrong, Teuerle told him to keep his mouth shut. On March 1, 2011, RMI issued a memo requiring officers on the MTA account to cover DWP posts while the guards assigned to the posts took meal breaks. When Zelaya brought this to Teuerle's attention, Teuerle responded that a supervisor was unavailable to cover the DWP graveyard shift due to economic considerations.

At his deposition, Zelaya stated that he had never told the MTA of billing problems. He admitted at trial that he had never worked in RMI's accounting department, did not have access to the billing system, files, or invoices, and could not

point to any bills in which the MTA had been billed for time that was not worked.  He did not know whether the duplicative time sheets were included in a final bill to the MTA or whether the MTA was ever billed for any work done on the DWP account.

4. *Zelaya's disciplinary history and job performance*

On March 11, 2010, Zelaya was verbally counseled for speeding in a company vehicle while on supervision patrol.

On April 28, 2010, Zelaya was verbally warned for not taking lunch at the appropriate time during his shift.

On August 12, 2010, Aparicio and Gaash met with Zelaya to discuss his aggressive and demeaning behavior when interacting with other officers and his statements to other employees in which he "bad-mouth[ed]" the company.  Aparicio had been informed that Zelaya belittled and intimidated other employees and abused his power as a supervisor.  The meeting was documented in a memorandum.

On September 17, 2010, Zelaya received a written warning regarding an incident in which he accused his supervisor at the time, Beltran, of stealing a patrol vehicle camera.  Zelaya also accused RMI Sergeant Hector Jaranilla of stealing the camera, which was eventually found under the vehicle's seat.  Zelaya was very upset and irate.  RMI was concerned that Zelaya's reaction to the missing camera was highly inappropriate.  Zelaya claimed at trial that RMI's description of the incident was not accurate.

In December 2010 and January 2011, Zelaya received verbal and written warnings for failing to properly fill out his meal and break log sheet on four occasions.

In March 2011, employee Jorge Santos called Teuerle to complain about Zelaya's behavior.  At Teuerle's request, Santos put his concerns in writing.  Santos's written "incident report" stated: "For the last few days" Zelaya had been "talking in a negative way about RMI Co. performance and specially about project mgr.  Paul Teuerle and Chris Conger['s] knowledge about the contract with MTA.  He blames Paul Teuerle by using zone patrol officers to work for officers that call off instead of giving the overtime

6

away, to save revenue for RMI Co.  He said RMI Co. don't deserve to keep the contract because while we get pay cheap wages the owner Mr. Rodriguez can afford a new luxury mobile home and buying the property in the corner from RMI offices.  He's always speaking negative things about RMI Company."  Teuerle believed these comments were inappropriate.

At trial, Santos, who was no longer employed by RMI, testified that Teuerle had asked him to provide negative information about Zelaya because he needed to " 'get rid of this guy' " and " 'people from upstairs want me to get rid of this guy.' "  Teuerle implied that Santos might get Zelaya's job if Zelaya left.  Teuerle did not, however, ask Santos to lie.  Teuerle denied asking Santos to report negative information about Zelaya and never promised to consider him for Zelaya's job.

Teuerle felt Zelaya was "dictatorial in the way that he would approach the officers."  Zelaya had also inappropriately displayed one employee's paycheck to another employee, and had repeatedly shared information regarding discipline meted out to particular officers with other officers.  On March 11, 2011, an employee named Martel complained to Aparicio about a confrontation he had with Zelaya.

5.  *Conflict of interest*

While employed by RMI, Zelaya admittedly worked for a competitor, Safe-Tek. Zelaya did not disclose his employment with Safe-Tek to RMI.  According to RMI President Rodriguez, shortly after Zelaya was hired in 2008, the pastor of a church for which RMI was providing security informed Rodriguez that Zelaya had attempted to solicit the church's business "for his own."  Rodriguez told Zelaya his behavior was inappropriate.  Zelaya claimed the incident was a misunderstanding.  Rodriguez did not fire Zelaya because he wanted to work with him.

Zelaya subsequently used RMI company time to schedule RMI officers to work on Safe-Tek accounts.  This caused a conflict with RMI.  Among other things, those officers were not available to cover call-offs for RMI if they were working for Safe-Tek.  Zelaya denied recruiting RMI employees to work at Safe-Tek.

## 6. *Zelaya's termination*

RMI terminated Zelaya's employment on March 11, 2011, for conflict of interest and substandard performance. RMI personnel denied terminating Zelaya in retaliation for any complaints about billing and denied Zelaya had made such complaints.

## 7. *The performance evaluations and Beltran's testimony*

At trial, Zelaya offered into evidence two favorable performance evaluations, signed by Beltran and purportedly covering the periods September 2008 through January 2010 and February 2010 through June 2010.

Aparicio testified that the company had not prepared any performance reviews on Zelaya, and the two evaluations introduced by Zelaya were not contained in his personnel file.

Beltran, called as a witness for RMI, testified that after he and Zelaya had both been terminated from RMI, he began working for Zelaya at Safe-Tek. After the instant lawsuit was filed, and after both Zelaya and Beltran had been terminated by RMI, Zelaya presented Beltran with blank RMI performance review forms and asked him to prepare and backdate them. Beltran filled out the reviews as Zelaya requested because he was working for Zelaya at Safe-Tek and did not want to lose work. The two reviews were "fake performance reviews" that did not accurately reflect Zelaya's performance when he was supervised by Beltran at RMI.[1] Beltran testified that when he supervised Zelaya, Zelaya failed to "use tact," had difficulty communicating with his employees, and was aggressive. Subordinates frequently complained about Zelaya. Zelaya was not pleased when he discovered Beltran had been deposed by RMI. Beltran told Zelaya he planned to tell the truth and would not lie under oath. Zelaya took away Beltran's hours at Safe-Tek.

While on duty at RMI, Zelaya spoke to RMI employees about Safe-Tek and scheduled them for Safe-Tek shifts. This created a conflict of interest with RMI and scheduling problems for Beltran.

---

[1]     Beltran testified that he had not informed Zelaya's attorney that the performance evaluations were inaccurate.

Contrary to Zelaya's testimony that he had been unable to find steady work as a supervisor after his termination, Beltran testified that Zelaya worked at Safe-Tek from 2011 through 2013; was in charge of payroll, scheduling, and hiring; and worked there on a daily basis.

8. *Zelaya's post-termination anonymous letter to the MTA*

One week after his termination, on March 18, 2011, Zelaya sent the MTA an anonymous letter, apparently alleging that RMI had improperly billed the MTA.[2] As a result, RMI added a checks-and-balances system to ensure accurate monitoring of post assignments and time keeping. The MTA renewed its contract with RMI in 2011 and 2012. It did not find that RMI engaged in improper billing.

9. *Zelaya's action against RMI, verdict, and appeal*

On March 7, 2012, Zelaya filed a complaint alleging six causes of action against RMI: (1) race discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940); (2) race discrimination in violation of public policy; (3) retaliatory discharge in violation of Labor Code sections 1102.5 and 98.6; (4) retaliatory discharge in violation of public policy; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress. The infliction of emotional distress claims were dismissed prior to trial. The trial court granted RMI's motion for nonsuit on the two race discrimination causes of action at the close of plaintiff's case-in-chief. After deliberating for less than one hour, the jury rendered a verdict in favor of RMI on the remaining two causes of action for retaliatory discharge. The verdict was 11 to 1 in favor of RMI.

The trial court denied Zelaya's motion for a new trial, brought on grounds that it erroneously excluded witness testimony and the special verdict form was defective. Zelaya timely appeals the judgment.

---

[2] The anonymous letter has not been made a part of the record on appeal.

9

DISCUSSION

1. *Claims of instructional error*

Zelaya contends the trial court erroneously instructed the jury on both his Labor Code section 1102.5 and discharge in violation of public policy claims. We discern no error.

a. *Standard of review*

A party is entitled to have the jury instructed on his or her theories of the case that are supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572; *Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358; *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475.) A court may refuse a proposed instruction that incorrectly states the law. (*Alamo,* at p. 475.) We independently review claims of instructional error. (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 743; *Alamo,* at p. 475.) When the contention on appeal is that the trial court erred by failing to give a requested instruction, we review the record in the light most favorable to the claim of instructional error. (*Alamo,* at p. 475; *Ayala,* at p. 1358; *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845-846 (*Mize-Kurzman*).) "In other words, we assume the jury might have believed the evidence favorable to the appellant and rendered a verdict in appellant's favor on those issues as to which it was misdirected." (*Mize-Kurzman,* at p. 846.)

A failure to properly instruct a jury in a civil case is not inherently or necessarily prejudicial. (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 580; *Mize-Kurzman, supra,* 202 Cal.App.4th at p. 846.) Instead, a judgment may be reversed for instructional error only when the error resulted in a miscarriage of justice. (*Soule,* at pp. 570, 580; *Alamo v. Practice Management Information Corp., supra,* 219 Cal.App.4th at pp. 475-476.)

10

b. *The Labor Code section 1102.5 instruction*

At the time of trial, former section 1102.5, subdivision (b) of the Labor Code provided: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."[3] Labor Code section 1102.5 is a whistleblower statute, which reflects the broad public policy of encouraging workplace whistleblowers to report unlawful acts without fear of retaliation. (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77; *Hager v. County of Los Angeles* (2014) 228 Cal.App.4th 1538, 1548 (*Hager*); *McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 468.) Labor Code section 1102.5, subdivision (b) protects an employee from retaliation by his employer for making a good faith disclosure of a violation of federal or state law to a government agency. (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 (*Patten*).) An employee engages in protected activity under Labor Code section 1102.5, subdivision (b) when he or she discloses reasonably based suspicions of illegal activity. (*McVeigh,* at p. 469.) Disclosures involving internal matters, as opposed to violations of law, do not fall within the statute's ambit. (*Patten,* at pp. 1384-1385.) "Section 1102.5 of the Labor Code requires that to come within its provisions, the activity disclosed by an employee must violate a federal or state law, rule or regulation. [Citation.]" (*Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809, 821–822; *Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191, 1200-1205.)[4]

---

[3] Labor Code section 1102.5 was amended effective January 1, 2014. (Stats. 2013, ch. 781, § 4.1.) All further citations to section 1102.5 are to the former version of the statute.

[4] Effective January 1, 2014, Labor Code section 1102.5, subdivision (b) encompasses "violation of or noncompliance with a local, state, or federal rule or regulation."

11

To establish a prima facie case of retaliation under Labor Code section 1102.5, subdivision (b), the plaintiff must show he engaged in protected activity, his employer subjected him to an adverse employment action, and there is a causal link between the two. If the plaintiff meets his prima facie burden, the defendant has the burden to prove a legitimate, nonretaliatory explanation for its actions. The burden then shifts back to the employee to show that the explanation is a pretext for the retaliation. (*Hager, supra,* 228 Cal.App.4th at p. 1540; *Patten, supra,* 134 Cal.App.4th at p. 1384.)

The trial court here instructed with the standard version of CACI No. 2730 in effect at the time, tailored to suit the evidence, as follows: "Osmar Zelaya claims that RMI discharged him in retaliation for his disclosure of information of an unlawful act. In order to establish this claim, Osmar Zelaya must prove all of the following: [¶] 1. That Osmar Zelaya was an employee of RMI; [¶] *2. That Osmar Zelaya made a complaint to the Metropolitan Transportation Authority that RMI was sending illegal bills to the Metropolitan Transportation Authority*[;] [¶] *3. That Osmar Zelaya had reasonable cause to believe that the information disclosed to the Metropolitan Transportation Authority was a violation of a state law, rule or regulation;* [¶] 4. That RMI discharged Osmar Zelaya; [¶] 5. That Osmar Zelaya's disclosure of information to the Metropolitan Transportation Authority was a motivating reason for RMI's decision to discharge Osmar Zelaya; [¶] 6. That Osmar Zelaya was harmed; and [¶] 7. That RMI's conduct was a substantial factor in causing Osmar Zelaya's harm. [¶] The disclosure of practices that an employee believes to be unwise, wasteful, gross misconduct, or the like, is not protected. Instead, Osmar Zelaya must have reasonably believed that RMI's submission of illegal invoices to the Metropolitan Transportation Authority violated state statutes, rules, or regulations. [¶] It is not Osmar Zelaya's motivation for his disclosure, but only the content of that disclosure, that determines whether the disclosure is protected."

Zelaya requested that the trial court instead instruct on elements 2 and 3 as follows: "2. That Osmar Zelaya disclosed to the MTA that Zone Patrol Officers were being used to cover posts; [¶] 3. That Osmar Zelaya had reasonable cause to believe that

12

using Zone Patrol Officers to cover posts would result in noncompliance with a state or federal law." The trial court rejected the proposed language on element 2, explaining, "He has to disclose something illegal. Illegal billing. False billing. Call it what you want."

Zelaya argues that the trial court erred by refusing his proposed instruction. He urges that the instruction given misdescribed the protected activity in which he claimed to have engaged. He avers that he was not required to show he complained that RMI was sending illegal bills to the MTA, but only that he reasonably believed his complaints about the use of zone patrol officers disclosed illegal activity. Further, the instruction given did not conform to the evidence, in that he did not testify he complained to the MTA about illegal bills, but disclosed staffing practices that did not comply with the law. RMI counters that, in order to trigger Labor Code section 1102.5's whistleblower protection, an employee must disclose activity that he reasonably believes to be illegal. Therefore, the jury was properly instructed that it must find Zelaya complained about illegal activity.

We discern no error. The instruction proposed by Zelaya was, at best, incomplete. The use of zone patrol officers to cover posts, if divorced from the issue of any resultant double or over-billing, was not a disclosure of a violation of a state or federal law or regulation. As explained, to constitute a protected disclosure under Labor Code section 1102.5, the report must be of activity the employee reasonably believes is illegal. (Lab. Code, § 1102.5, subd. (b); *Mueller v. County of Los Angeles, supra,* 176 Cal.App.4th at pp. 821-822; *Mize-Kurzman, supra,* 202 Cal.App.4th at pp. 853-854; *Patten, supra,* 134 Cal.App.4th at pp. 1384-1385.) By itself, the fact that zone patrol officers sometimes covered open posts when the assigned guard unexpectedly did not arrive for work is simply not a disclosure of illegal activity. Apart from his testimony that he thought this staffing practice resulted in overbilling, there was no evidence Zelaya reasonably believed the use of zone patrol officers was illegal. Thus, the proffered

13

instruction was not a correct statement of law, and the trial court did not err by declining to give it.[5]

Moreover, the instruction given by the court was consistent with Zelaya's theory. From start to finish, Zelaya equated his complaints about staffing issues with fraudulent billing. During opening statement, Zelaya's counsel stated he intended to prove RMI retaliated against Zelaya "because he complained about . . . his belief that illegal conduct was going on at R.M.I. with respect to how they were billing and the way they were performing services under a contract that the company had" with the MTA. "What Mr. Zelaya came to believe is that the company was still billing M.T.A. for the services of the supervisor as performing supervisory services and using the car to drive around, and also billing for . . . a security guard when it was the supervisor that was actually performing the security guard services standing at a particular post . . . ." "Mr. Zelaya knew that the company . . . was having supervisors not do their work as supervisors, but doing guard work. So that is the source of his knowledge and his belief that the company was double billing the M.T.A. on this contract." Zelaya was terminated after he complained "to the M.T.A. about the services that were being performed and whether or not there was double billing going on in this case."

Zelaya testified that after Teuerle took over the MTA account, he suspected there were "problems with the way that they were billing" the MTA. He was "100 percent they [were] doing something wrong" because RMI used zone patrol officers to cover standard posts; the supervisors signed into both locations, even though one was not being covered; and Conger did not "subtract the hours" in instances when "nobody was" covering one of the posts. Zelaya saw "two [time] sheets signed for the same person." He told Teuerle that "if we send all these hours, . . . you will overbill it to M.T.A."

---

[5] Labor Code section 1102.5 protects disclosures of violations of both state and federal law. Zelaya agreed to omission of a reference to federal law because, as relevant to his claim, the state and federal laws do not differ. Zelaya does not contend the instruction was defective in this regard.

14

Although he did not see the final bills, he saw Conger input the hours into the system and "they were submitting the hours." He told Conger, Teuerle, and Rochell that he felt there was overbilling. When Sergeant Pu asked if RMI still had a problem with the "open post," Zelaya replied that they did. Zelaya believed he was disclosing to Pu "a problem with respect to overbilling," because RMI "was using one officer to cover the two locations." When asked on cross-examination, "Is it then true that you never reported to the M.T.A. that there was any improper billing going on by R.M.I.," Zelaya responded, "I reported to Pu." In argument to the jury, Zelaya's counsel pointed out that Zelaya had testified he complained to both Teuerle and Conger "about the way that they were doing the billing and what was going on with respect to the bills and use of the personnel who Metropolitan Transportation Agency was paying for. So Osmar Zelaya's testimony supports the fact that complaints about R.M.I billing were made."

Given the evidence at trial and the clarity of plaintiff's theory, it is unlikely jurors would have understood the phrase "sending illegal bills" to exclude complaints about the underlying staffing practices that purportedly resulted in those bills. Put differently, the jury was likely to understand "illegal bills" to encompass Zelaya's complaints about the conduct that resulted in those bills. A better instruction could no doubt have been crafted, that avoided using the phrase "sending illegal bills" and instead substituted something such as "staffing practices that resulted in overbilling." However, Zelaya did not suggest such an instruction. (See *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1686.)

Zelaya complains that in closing argument the defense "took full advantage" of the challenged instruction by highlighting the "illegal billing" language,[6] urging that the case

---

[6] RMI's counsel argued that "This verdict form does not ask you if [Zelaya] was complaining about zone patrol, filling in on other [posts], if he was complaining about somebody standing post at [DWP], if he was complaining about supervisors filling in when somebody calls off. This case has a specific issue in it. It is the illegal conduct. Illegal billing. That is what you have to find." "[W]hat he has to demonstrate is that there was illegal conduct. When you see . . . the jury instructions, it is going to be very clear. This is not about whether we use zone patrol to cover a post. This is not about

was about illegal billing, not staffing or the use of zone patrol officers. Zelaya, however, did not object to these arguments and cannot now raise the issue. " 'Generally, an appellant forfeits the right to attack error by expressly or impliedly agreeing at trial to the procedure objected to on appeal.' [Citation.] By remaining silent during . . . counsel's zealous closing argument," Zelaya "forfeited any right to challenge the remarks as improper or inflammatory at this juncture." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 200.)

To the extent Zelaya intends to argue the instruction given required the jury to find RMI *actually* engaged in illegal billing, this contention lacks merit. Zelaya is correct that a plaintiff engages in protected activity if he discloses activities he reasonably believes violate the law, even if he is incorrect. (*Mize-Kurzman, supra,* 202 Cal.App.4th at p. 854; cf. *McVeigh v. Recology San Francisco, supra,* 213 Cal.App.4th at pp. 457- 458.) However, the instruction given adequately conveyed this concept. Element 3 stated, "That Osmar Zelaya *had reasonable cause to believe* that the information disclosed" violated the law. (Italics added.) This was reiterated later in the portion of the instruction stating that the disclosure of unwise practices is not protected; "[i]nstead, Osmar Zelaya must have *reasonably believed* that RMI's submission of illegal invoices" violated the law. (Italics added.)

---

whether we had guards who worked multiple contracts. This is not about whether or not we had supervisors stand post in emergencies, none of that is illegal conduct. None of that. This is about whether or not we sent a bill that was false. That we billed the government agency for something we did not do. That is the illegal conduct. [¶] When you see the jury instructions, 2430 and 2730, 2730 does not say 'zone patrol.' 'Supervisor standing post.' 'Not manning the post.' [¶] It says that Osmar Zelaya made a complaint to the M.T.A. that R.M.I was sending illegal bills to the M.T.A. [¶] . . . Osmar Zelaya's complaint about R.M.I billings to the [MTA] that he reasonably believed were illegal was a motivating reason for the termination. [¶] That is what this case was about. Whether or not he complained about illegal billing, not all this zone patrol stuff. . . . As long as we don't bill somebody for something we did not do, it is not a problem. That is called staffing."

Zelaya's argument to the jury stressed that he needed only a reasonable belief he disclosed a violation of the law. Counsel urged that although Zelaya had not worked in the billing department, "the information that he had caused him to believe that it was going out as double billing. That is what counts, not whether there was actually illegal billing, but whether or not Mr. Zelaya . . . reasonably believed that there was illegal billing." It is true that defense counsel argued, incorrectly, that Zelaya had to show the conduct complained about was *actually* illegal. (See fn. 6, *ante.*) However, Zelaya did not object to this argument and has forfeited any claim that RMI's erroneous argument was prejudicial. (*Soto v. BorgWarner Morse TEC Inc., supra,* 239 Cal.App.4th at p. 200.) Zelaya's counsel reiterated the correct standard in his closing argument, pointing out that "[t]he jury instructions do not say that there must be illegal billing for the company to have retaliated. . . . The instructions say there must be a reasonable belief. Mr. Zelaya has had a reasonable belief." Absent some contrary indication in the record, which is not present here, we presume the jury followed the trial court's instructions. (*Ibid.*)

Zelaya is correct that an employee need not identify a particular statute or state a legal conclusion when making a disclosure. (See *Mize-Kurzman, supra,* 202 Cal.App.4th at p. 865 ["the disclosure was not that plaintiff believed the conduct was illegal, but her disclosure . . . of the asserted illegal conduct itself"].) However, nothing in the instructions given imposed such requirements.

For the first time in his reply brief, Zelaya contends that breach of the contract terms constituted a false claim, even if there was no double or fraudulent billing.[7] Citing *San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438, Zelaya argues that a false claim " ' "may take many forms, the most common being a claim for goods or services not provided, *or provided in violation of contract terms, specification, statute or regulation.*" ' " (*Id.* at p. 449.) He argues that

---

[7] Zelaya appears to refer to California's False Claims Act, Government Code section 12650 et seq.

Gaash admitted that when RMI used a zone supervisor to fill a standing guard position, the company failed to meet its contractual responsibilities to the MTA, in that the contract required zone patrol officers to supervise parking lots and guards. Thus, he avers that RMI's failure to have zone supervisors do the work they were contracted to do was unlawful, regardless of whether RMI ever double billed the MTA.

Whatever the merits of this argument, Zelaya cannot raise it at this juncture. He did not advance the theory that the law was violated because the contract terms were not followed in regard to zone patrol officers below, nor did he proffer an instruction based upon it. "Whereas in criminal cases a court has strong sua sponte duties to instruct the jury on a wide variety of subjects, a court in a civil case has no parallel responsibilities. A civil litigant must propose complete instructions in accordance with his or her theory of the litigation and a trial court is not 'obligated to seek out theories [a party] might have advanced, or to articulate for him that which he has left unspoken.' " (*Mesecher v. County of San Diego, supra,* 9 Cal.App.4th at p. 1686; see *JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.)

Moreover, Zelaya failed to raise this claim in his opening brief. Generally, issues not raised in the trial court are waived, and points raised for the first time in a reply brief on appeal will not be considered. (*Cruz v. Sun World Internat., LLC* (2015) 243 Cal.App.4th 367, 380; *Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 504, fn. 3; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)[8] Therefore, we do not consider this contention.

c. *The instruction on the* Tameny *cause of action*

Zelaya also complains about the instruction given on the fourth cause of action for wrongful termination in violation of public policy, commonly known as a *Tameny* claim. (See *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167; *Ferrick v. Santa Clara University* (2014) 231 Cal.App.4th 1337, 1340.) While the record is not entirely clear, it

---

[8]    In light of our conclusion that the instruction given was not erroneous, we do not reach the issue of prejudice.

18

appears Zelaya originally proposed an instruction based on CACI No. 2505 (retaliation in violation of the California Fair Employment and Housing Act, Gov. Code § 12940, subd. (h).)[9] After discussions with the trial court, he withdrew his proposed instruction and agreed to the instruction eventually given, which was based on CACI No. 2430. The agreed-upon instruction provided: "Osmar Zelaya claims that he was discharged from employment for reasons that violated a public policy. To establish this claim, Osmar Zelaya must prove all of the following: [¶] 1. That Osmar Zelaya was employed by RMI; [¶] 2. That RMI discharged Osmar Zelaya; [¶] 3. *That Osmar Zelaya's complaints about RMI billings to the Metropolitan Transportation Authority that he reasonably believed were illegal was a motivating reason for RMI's decision to discharge Osmar Zelaya*; and [¶] 4. That the discharge caused Osmar Zelaya harm." (Italics added.)

Zelaya argues that the instruction given was inadequate because it did not allow the jury to find his complaints to RMI, as opposed to the MTA, supported his wrongful

---

[9]   The proposed instruction, as included in appellant's appendix and discussed in his opening brief, was CACI No. 2505. It provided, in pertinent part: "Osmar Zelaya claims that RMI retaliated against him for complaining about alleged illegal billing by RMI on a contract with the Metropolitan Transportation Authority to provide security services. To establish this claim, Osmar Zelaya must prove all of the following: [¶] 1. That Osmar Zelaya complained about alleged illegal billing by RMI on a contract with the Metropolitan Transportation Authority to provide security services" and "3. That Osmar Zelaya's complaining about alleged illegal billing by RMI on a contract with the Metropolitan Transportation Authority to provide security services was a motivating reason for RMI's decision to discharge Osmar Zelaya."

When conferencing on the appropriate instruction on the *Tameny* claim, the parties discussed a version of CACI No. 2430 that the trial court indicated it had received "from plaintiff's side." The parties' appendixes do not include the version of CACI No. 2430 proposed by Zelaya. When the parties discussed CACI No. 2430, Zelaya's counsel agreed with RMI's request to substitute "illegal" for "improper," acquiesced in CACI No. 2430 as given, and withdrew his proposal to give CACI No. 2505. Although RMI contends Zelaya proposed the instruction that was ultimately given, the portions of the record cited by RMI refer not to the instruction, but to the special verdict form (discussed *post*).

19

termination in violation of public policy claim. The version of Labor Code section 1102.5 in effect at the time required as an element that the plaintiff made a disclosure to a government or law enforcement agency. In contrast, a plaintiff's complaint of a violation of public policy made to his or her employer may suffice for a *Tameny* claim. To recover in tort for wrongful discharge in violation of public policy, the plaintiff must show he reasonably believed the employer violated a substantial, fundamental public policy affecting society at large, grounded in a statutory or constitutional provision. (*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at pp. 75-76, 87; *Holmes v. General Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 1426; *Ferrick v. Santa Clara University, supra,* 231 Cal.App.4th at p. 1343; *Barbosa v. IMPCO Technologies, Inc.* (2009) 179 Cal.App.4th 1116, 1121-1122.) "Consistent with these principles, courts have recognized tortious wrongful discharge claims where an employee establishes he was 'terminated in retaliation for reporting to his or her employer reasonably suspected illegal conduct . . . that harms the public as well as the employer.' [Citations.]" (*Holmes,* at p. 1426; see also *Ferrick,* at p. 1340.) Zelaya urges that the version of CACI No. 2430 given here improperly required that his complaints were made *to the MTA*, and no instruction permitted the jury to find he was terminated for complaints *made to RMI.*

First, Zelaya has forfeited his contention because he agreed to the instruction and withdrew his proposed instruction. It is well settled that "an appellant may waive his right to attack error by expressly or impliedly agreeing at trial to the ruling or procedure objected to on appeal. [Citation.]" (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 166; *Soto v. BorgWarner Morse TEC Inc., supra,* 239 Cal.App.4th at p. 200; *Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 181; cf. *Tesoro del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 640-641.) Zelaya's citation to Code of Civil Procedure section 647 and *Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, for the proposition that under section 647 instructions are " 'deemed to have been excepted to,' " is unavailing. "We cannot see that the rule applies. Code of Civil Procedure section 647 does not negate the doctrine of

invited error. If a party affirmatively agrees to an instruction, we do not ignore that fact and deem an objection." (*Ventura v. ABM Industries Inc.* (2012) 212 Cal.App.4th 258, 271.)

Second, it is not likely the jury interpreted the instruction as Zelaya suggests. The pertinent language was ambiguous. "Zelaya's complaints about RMI billings to the Metropolitan Transportation Authority" can be read to mean either (1) complaints made about bills provided to the MTA, or (2) complaints made to the MTA about billing. Under the first reading, Zelaya's complaints made to RMI are included. Zelaya's counsel expressly adopted this reading of the instruction during argument, explaining: "So the difference between the two instructions is that 2730 requires you to consider the disclosure that was made to the M.T.A. and Sergeant Pu, and the 2430 instruction just requires there to be complaints to anybody at R.M.I. or Metropolitan Transportation Authority that got to R.M.I, just that there be complaints to R.M.I. . . . ." RMI did not contradict this statement in argument but instead urged that Zelaya had not made any complaints to either RMI or the MTA prior to Zelaya's termination. Given the instruction's language and the parties' arguments, it is unlikely jurors would have read CACI No. 2430 to exclude complaints to RMI alone.[10]

d. *At-will and mixed motive instructions*

Over Zelaya's objection, the trial court gave CACI No. 2400, regarding at-will employment, at RMI's request.[11] Zelaya contends this was error because, although the

---

[10]    In his reply brief, Zelaya argues that, as with his claims of error in regard to the Labor Code section 1102.5 instruction, CACI No. 2430 was defective because it required a finding he complained about illegal billing, rather than the use of zone patrol officers to cover posts, or RMI's failure to provide services required under the contract. We have already addressed these contentions *ante,* and our analysis is equally applicable to Zelaya's concerns about CACI No. 2430.

[11]    CACI No. 2400, as given to the jury, stated: "An employment relationship may be ended by either the employer or the employee, at any time, for any lawful reason, or for no reason at all. This is called 'at-will employment.' [¶] An employment relationship is

instruction correctly stated the law (see Labor Code, § 2922), no contract claim was at issue and it was undisputed he was an at-will employee. Therefore, he argues, the instruction was irrelevant.

It is error to give an instruction that is correct in the abstract, but " ' "is not within the issues developed by the evidence or reasonable inferences therefrom. And if it is likely to mislead the jury the error is prejudicial." ' " (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 25; *DeGeorge v. Crimmins* (1967) 254 Cal.App.2d 544, 547.) However, RMI contended below that the instruction was warranted because it wished to argue that if the jury found the termination was not retaliatory, it could not find in Zelaya's favor simply because it believed there was no good cause for his termination. The trial court agreed that "[t]hroughout this case," Zelaya had contended he was unjustifiably terminated, and there was "no good cause because the performance on the job was good."

We discern no error. While the case did not involve a contract claim, RMI's argument was relevant to the issues presented by the evidence, and Zelaya cites no authority holding use of the instruction was error on facts similar to those presented here.

Zelaya also contends that, having given the at-will instruction, the trial court should have given an instruction setting forth the principles in Labor Code section 1102.6. That statute provides: "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (Lab. Code, § 1102.6.) Zelaya contends the

---

not 'at-will' if the employee proves that the parties, by words or conduct, agreed that the employee would be discharged only for good cause."

court should have given CACI No. 2731 or a similar instruction setting forth these precepts.

However, neither party requested such a "mixed motive" instruction.[12] If Zelaya felt such an instruction was necessary, either before or after the trial court decided to give the at-will instruction, it was incumbent upon him to request it. " ' " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' " ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131.) " 'Neither a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken.' . . . Plaintiff's failure to request any different instructions means he may not argue on appeal the trial court should have instructed differently.' " (*Ibid.*) Zelaya has accordingly waived any contention that the instruction was improperly omitted.

2. *The special verdict form*

Zelaya contends reversal is required because the special verdict form was defective. We disagree.

Zelaya proposed the special verdict form that was given to the jury. It stated, in pertinent part: "1. Do you find that RMI International Inc. terminated Osmar Zelaya's employment in retaliation for complaining that RMI International Inc. was illegally billing the Metropolitan Transportation Authority?" "2. Was the conduct of RMI International Inc. that led you to answer 'yes' to Question 1 a substantial factor in causing harm to Osmar Zelaya?"

When the trial court and the parties discussed the special verdict form shortly before closing arguments, RMI's counsel indicated his agreement with the proposed form. After reconsidering the proposed form, Zelaya's counsel affirmed, "content wise it looks fine."

---

[12]    RMI initially proposed, but then withdrew, a mixed motive instruction.

23

During argument to the jury, both attorneys displayed and/or discussed the special verdict form. The jury retired for deliberations at 4:12 p.m. on June 13, 2013.

The jury resumed deliberations at 9:15 a.m. on June 14. When he arrived at court on June 14, plaintiff's counsel provided the trial court with a new proposed special verdict form which he requested be substituted for the original special verdict form, which had not yet been handed to the jury. It stated, in pertinent part: "1. Do you find that a motivating reason for RMI International Inc.'s termination of Osmar Zelaya's employment was that Osmar Zelaya complained that RMI International Inc. was illegally billing the Metropolitan Transportation Authority?" "2. Did Osmar Zelaya's termination by RMI International Inc. cause him harm?"

Plaintiff's counsel opined that the original special verdict form was "confusing" because it contained only one question whereas there were two causes of action, and it did not address the elements of the claims. He explained that in light of the court's rulings on the jury instructions, he had believed the original form was adequate. However, after making his closing argument and reviewing the instructions, he realized that form omitted elements and did not mention a "motivating reason." Defense counsel objected that the request was untimely in light of the fact he had published the original special verdict form to the jury.

The trial court denied Zelaya's request to substitute the new verdict form. It explained the original form that had been agreed upon was consistent with the causes of action, whereas the proposed form was not. The jury rendered its verdict in favor of RMI at 9:45 a.m.

Zelaya argues that the special verdict form was erroneous because it did not require that the jury determine all controverted issues. In particular, he avers that it did

not require the jury to resolve the question of whether he had reasonable cause to believe he had disclosed that RMI was engaged in unlawful activity.[13]

A "special verdict is that by which the jury find the facts only, leaving the judgment to the court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)  " 'Unlike a general verdict (which merely *implies* findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case.  The jury must resolve all of the ultimate facts presented to it in the special verdict, so that "nothing shall remain to the court but to draw from them conclusions of law." [Citation.]  [¶]  The requirement that the jury must resolve every controverted issue is one of the recognized pitfalls of special verdicts.  "[T]he possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings[.]" [Citations.]' " (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 959-960 (*Myers*).)  We review a special verdict form de novo.  (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.)

The short answer to Zelaya's argument is that, assuming arguendo the special verdict form was defective, the invited error doctrine defeats his claim.  As the court explained in *Myers, supra,* 13 Cal.App.4th 949:  "It is incumbent upon counsel to propose a special verdict that does not mislead a jury into bringing in an improper special verdict. [Citation.] [Respondent's] failure to propose an appropriate special verdict was responsible for the erroneous special verdict, and its good faith in this respect is immaterial. [Citation.]" (*Id.* at p. 960, fn. 8; see also *Mesecher v. County of San Diego, supra,* 9 Cal.App.4th at pp. 1685-1687.)  As in *Myers,* here any flaw in the special verdict

---

[13]    RMI argues that Zelaya has failed to include in the record the substitute special verdict form requested, and therefore the record is inadequate.  RMI is incorrect; Zelaya has included in his appendix a copy of the substitute order he proposed on June 14, 2013.

form was the fault of plaintiff.  (See *Myers,* at p. 960, fn. 8.)  Zelaya proposed the special verdict form and approved it shortly before the jury was instructed.  Accordingly, Zelaya is bound by the special verdict.  (*Ibid*; *Mesecher,* at p. 1687.)

Nor does the fact Zelaya belatedly requested substitution of a different special verdict form require a contrary conclusion.  "It is incumbent upon trial judges to manage trials efficiently."  (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 20.)  "A trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it.  [Citations.]  This authority includes the power to supervise proceedings for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences that tend to delay the conduct of its proceedings."  (*Id.* at p. 22, fn. omitted; Code Civ. Proc., § 128, subd. (a).)  The parties had already discussed or displayed the first special verdict form during argument to the jury.  Substituting a new form could have confused the jury and/or necessitated additional argument.  The court did not abuse its discretion by refusing Zelaya's belated request.

Moreover, the authorities cited by Zelaya do not support his contention that the special verdict form was flawed.  In *Myers,* a jury found in favor of a building contractor on a breach of contract claim and awarded punitive damages.  On appeal, the punitive damage award was stricken because it was not based on a tort verdict.  (*Myers, supra,* 13 Cal.App.4th at pp. 954-955.)  The jury had not been requested to make the necessary factual findings to support a fraud or other tort cause of action.  Thus, "without an actual verdict by the jury on a fraud (or other tort) cause of action, the instructions and evidence cannot support the punitive damage award."  (*Id.* at p. 961.)  Remand for a new trial was inappropriate because the contractor had failed to propose an appropriate special verdict form and had opposed the defendant's attempt to clarify the erroneous special verdict.  (*Id.* at p. 960, fn. 8.)

In *Saxena v. Goffney, supra,* 159 Cal.App.4th 316, the jury rendered a verdict for plaintiffs, the widow and children of a medical malpractice decedent. The special verdict

form plaintiffs prepared did not require a jury finding on whether the doctor committed battery. (*Id.* at pp. 320, 324.) On appeal, the defendant contended the verdict rendered by the jury, as submitted on the verdict form, did not support entry of judgment on a battery theory. (*Id.* at p. 324.) Because the special verdict form did not require the jury to make a finding on the battery claim, it was like a " 'puzzle with pieces missing; the picture is not complete,' " and the doctor's JNOV motion should have been granted. (*Id.* at pp. 321, 326.)

In *Fuller-Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958, the question was the reasonableness of an insured's bankruptcy settlement and the effect of its reorganization plan on its excess insurers. The trial court entered judgment in favor of the insured and the jury calculated the amount of the insurer's liability. On appeal the jury's findings were reversed because the special verdict form was fatally defective, in that it failed to require the jury to make any finding on the issue of the reasonableness of the reorganization plan. The jury's finding that the insured was not guilty of inequitable misconduct did not answer the distinctly different question of whether the plan was unreasonable. (*Id.* at pp. 1005-1006; see *Saxena v. Goffney, supra,* 159 Cal.App.4th at p. 326.)

Nothing similar occurred here. The special verdict form here did not fail to elicit a finding on either cause of action, nor did it omit a finding necessary to sustain the verdict rendered. Instead, the jury's negative finding on the first question answered the key issue in both causes of action. Even if the jury had been asked, and affirmatively answered, that Zelaya reasonably believed RMI was engaged in illegal activity and disclosed or complained about such activity, the jury's negative answer on the question of retaliation would have precluded a verdict in his favor on either cause of action.

3. *Exclusion of Montoya's testimony*

RMI moved in limine to exclude testimony and evidence not disclosed by Zelaya during discovery. Attached to the motion were Zelaya's responses to various interrogatories. Special interrogatory No. 13 asked, "State the names of all individuals to

27

whom YOU reported RMI's double billing." MTA Sergeant Rudy Montoya was not identified in Zelaya's response.

At the final status conference on May 29, 2013, Zelaya's counsel represented that Sergeant Montoya would testify that Zelaya "complained about the MTA false billing and what happened after that."

On June 10, 2013, after the jury had been sworn, the court and parties addressed the motions in limine. RMI's written motion in limine did not expressly seek to exclude Montoya, but in light of Zelaya's offer of proof at the final status conference, RMI sought to exclude him. Defense counsel averred that Montoya (1) had not been identified in Zelaya's response to special interrogatory No. 13; and (2) when counsel asked at Zelaya's deposition for the names of MTA employees to whom he had complained, Zelaya did not identify Montoya. When the parties revisited the issue the following day, Zelaya's counsel explained that whether or not Zelaya had identified Montoya, "Mr. Montoya has his own memories and his own testimony about what occurred. And that is what we intend to present here through Mr. Montoya." After reviewing the pertinent portions of Zelaya's deposition testimony and confirming that Zelaya had not identified Montoya in response to Judicial Council of California Form Interrogatory No. 12.1,[14] the trial court granted the motion to exclude Montoya, because "[h]e wasn't identified." Zelaya contends the trial court's ruling was an abuse of discretion. We agree, but conclude any error was harmless.

We review a trial court's evidentiary and discovery sanction rulings for abuse of discretion. (*Saxena v. Goffney, supra,* 159 Cal.App.4th at p. 332; *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422.) A court abuses its discretion if, in light of the applicable law and all of the relevant circumstances, its decision exceeds the

---

[14] Form interrogatory No. 12.1 asks for, inter alia, the name of each person who is claimed to have knowledge of the "incident." (*Saxena v. Goffney, supra,* 159 Cal.App.4th at pp. 330-331.)

28

bounds of reason and results in a miscarriage of justice. (*Saxena,* at p. 332; *New Albertsons, Inc.,* at p. 1422.)

A court may impose sanctions on a party, person, or attorney for misuse of the discovery process. (Code Civ. Proc., § 2023.030; *New Albertsons, Inc. v. Superior Court, supra,* 168 Cal.App.4th at p. 1422.) "[E]xclusion of a party's witness for that party's failure to identify the witness in discovery is appropriate only if the omission was willful or a violation of a court order compelling a response. (See Code Civ. Proc., §§ 2023.030, 2030.290, subd. (c), 2030.300, subd. (e) . . . .)" (*Mitchell v. Superior Court* (2015) 243 Cal.App.4th 269, 272; see also *Saxena v. Goffney, supra,* 159 Cal.App.4th at p. 332 ["Precluding a witness from testifying at trial is proper where a party *willfully and falsely* withholds or conceals a witness's name in response to an interrogatory"]; *Biles v. Exxon Mobil Corp.* (2004) 124 Cal.App.4th 1315, 1327.) Evidence may not be excluded on the ground an interrogatory answer is evasive or incomplete, or because a party failed to supplement an answer that was correct when made. (*Saxena,* at pp. 332-333.) "The party moving to exclude evidence as a sanction for discovery abuse has the initial burden of establishing grounds supporting the request. (Evid. Code, § 500.) Where . . . the court has not issued an order compelling a response or further response to an interrogatory (and where such an order has not been violated), the party moving for the exclusion of evidence has the burden of establishing the answer given by the responding party was willfully false, i.e., *intentionally not true.*" (*Saxena,* at p. 334; see also *New Albertsons, Inc.,* at p. 1426.)

Here, the trial court did not issue, and Zelaya did not violate, an order compelling further responses to the form or special interrogatories. RMI did not establish, and the trial court did not find, that Zelaya's response to Form Interrogatory No. 12.1, or his deposition testimony, was willfully false. Therefore, it was an abuse of discretion to exclude Montoya as a witness. (See *Mitchell v. Superior Court, supra,* 243 Cal.App.4th at p. 272.)

However, the trial court's misstep was harmless error. The erroneous exclusion of evidence requires reversal only when it is reasonably probable the party challenging the ruling would have obtained a more favorable result absent the error. (*Saxena v. Goffney, supra,* 159 Cal.App.4th at pp. 334-335.) Zelaya has the burden of demonstrating prejudice. (*Cox v. Los Angeles Unified School Dist.* (2013) 218 Cal.App.4th 1441, 1445.) Zelaya has not made such a showing here. It was undisputed that Zelaya never claimed he had complained to Montoya about inappropriate billing arising out of RMI's staffing practices. Zelaya did not make such a claim at his deposition. Zelaya did not testify at trial that he had complained to Montoya about billing improprieties. It was undisputed that Zelaya's discovery responses did not identify Montoya as someone to whom Zelaya had disclosed billing improprieties. Given that Zelaya's claim of wrongful termination was premised on the theory that he was fired in retaliation for just such complaints, the jury was likely to be skeptical of any argument that Zelaya simply forgot he had complained to Montoya. This was especially true in light of the compelling evidence regarding the backdated performance evaluations completed by Beltran. Knowing that Zelaya had never claimed he complained to Montoya, the jury was highly unlikely to credit any contrary testimony by Montoya. Accordingly, the error was harmless.

30

DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, Acting P. J.


We concur:



LAVIN, J.



JONES, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.